\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| Martha Vassalle, et. al., | : | Case No. 3:11CV0096 |
| Plaintiff | : | And Related Case |
| | | Case No. 3:10CV0091 |
| vs. | : | |
| | | **OBJECTION BY KELLI GRAY TO** |
| Midland Funding, LLC, et. al., | : | **PROPOSED SETTLEMENT** |
| Defendants. | : | HON. DAVID A. KATZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Table of Contents

Table of Contents ........................................................................................................... ii

Table of Authorities ....................................................................................................... iii

I. Introduction – Parties to Settlement ............................................................................ 1

    A. *Vassalle* ............................................................................................................. 3

    B. *Franklin* ............................................................................................................ 4

    C. *Brent* ................................................................................................................ 5

    D. Encore, Midland Credit Management, Midland Funding .................................. 5

II.  Encore's Superior Bargaining Position to *Vassalle* Consumers ............................... 6

III. Midland's Forum Shopping ...................................................................................... 6

IV. The Settlement Inadequately Addresses Issues of the Encore Scheme .................... 7

    A. *MCMI Affiant Elizabeth Neu* ....................................................................... 12

    B. Tu Uyen Huynh Excerpts – Attaching Documents to Affidavits ..................... 16

    C. Testimony of Principal and Shareholder Attorney Karen Hammer of Washington
       Collection Mill Law Firm Suttell & Hammer, P.S. ....................................... 20

V. The release is broader than the Court's interpretation of the Injunction. ................. 22

VI. Gray's Journey through the State and Federal Courts ............................................ 23

VII. The Attorney Fees are Excessive and Not Documented ......................................... 25

VIII. Settlement is Shockingly Low ............................................................................... 28

IX. Settlement Fails to Consider State Law Remedies .................................................. 30

X. Encore-Midland rejected Franklin as a Nationwide Class ...................................... 32

XI. Conclusion ............................................................................................................. 33

## **Table of Authorities**

**Cases**

*Am. Exp. Bank, FSB v. Dalbis*, 30 Misc. 3d 1235(A) (N.Y. Civ. Ct. 2011) ................................10

*Am. Sales, Inc. v. Boffo*, 71 Ohio App.3d 168, 593 N.E.2d 316 (1991) ..........................................9

*Class Plaintiffs v. City of Seattle (In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) ...............................................................................................27

*Debt Buyers' Ass'n v. Snow*, 481 F. Supp. 2d 1 (D.D.C. 2006) .....................................................11

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.*, 71 F.3d 1197
   (6th Cir. 1995)...................................................................................................................2, 4

Fox v. Citicorp Credit Services, Inc., 15 F.3d 1507 (9th Cir. 1994)........................................3, 22

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)............................................26, 27

*Gray v. Suttell/Midland,* U.S. District Court, Eastern District of Washington, Case
   No.: CV-09-0251-EFS ..........................................................................................................23

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 64 S. Ct. 997, 88 L.
   Ed. 1250 (1944) ......................................................................................................................8

*Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ...............................25

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) ...........................27, 28

*Jerman v. Carlisle, McNeil, Rini, Kramer & Ulrich, et. al.,* Case No. 1:06 CV-
   1397 (N.D. Ohio) ..................................................................................................................29

*Mahler v. Szucs*, 135 Wash.2d 398, 957 P.2d 632 (1998) ...........................................................31

*NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585 (6th Cir. 1987).....................................................4

*Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513 (6th Cir. 1993) ..........................25, 26

*Rucker v. United States Dep't of Labor*, 798 F.2d 891 (6th Cir. 1986) ...........................................4

*Schnall v. AT&T Wireless Servs., Inc.*, __ P.3d __, 2010 WL 185943 (Wash.
   2010) (en banc) ....................................................................................................................32

*Sonmore v. CheckRite Recovery Services, Inc.*, 206 F.R.D. 257 (D. Minn. 2001). ......................29

*State ex rel. Macri v. Bremerton*, 8 Wash.2d 93, 111 P.2d 612 (1941) .......................................32

*Summit Recovery, LLC v. Credit Card Reseller, LLC*, CIV.08-5273(DSD/JSM), 2010 WL 1427322 (D. Minn. Apr. 9, 2010)..............................................................11

*United States v. Smith*, 5:06-CR-00310-001, 2007 WL 4189469 (N.D. Ohio Nov. 19, 2007) aff'd, 319 F. App'x. 381 (6th Cir. 2009) ....................................................2

*United States v. Williams*, 2006 WL 3203748 (6th Cir. 2006) ...................................1, 4

## Statutes and Court Rules

15 U.S.C. § 1692..........................................................................................................24

15 U.S.C. § 1692k(a)(2)(B) .............................................................................................7

15 U.S.C. § 1692k(d) ....................................................................................................30

15 U.S.C. § 1692n ...........................................................................................................5

R.C.W. 19.16.250 ..........................................................................................................31

R.C.W. 19.16.450 ......................................................................................................7, 31

R.C.W. 19.86 .................................................................................................................32

R.C.W. 19.86.090 ..........................................................................................................32

RCW; 19.16.440 ............................................................................................................32

## Other Authorities

Gini Scott, Stephen Elias, & Lisa Goldoftas, "Collect Your Court Judgment", Nolo Press, California 2nd Edition (1993)..............................................................29

Hobbs, Fair Debt Collection Practices Act, NCLC, Appendix E; Unfair and Deceptive Acts and Practices, Appendix A & C. ...................................................32

## I. Introduction – Parties to Settlement

At the time the Court entered the order of preliminary approval of a nationwide class settlement and when the notice of the settlement was sent to the class members, the Court only had jurisdiction over only *one* case: V*assalle v. Midland Funding, LLC,* U.S. District Court Northern District of Ohio, Western Division, Case No. 3:11CV0096. The settlement was announced by Encore on February 14, 2011. See Encore 10-K filed with the SEC.[1] *Vassalle* was filed January 17, 2011, less than a month before at the tail end of the negotiations. (Doc.  #1). On January 18, 2011, Judge James G. Garr was assigned to the case. (Doc. #2). On February 22 and 28, the defendants waived service and appeared in the action. (Doc. #3, #4). No Answer was filed, no conference of counsel occurred, no scheduling order was entered, in fact nothing was done in the case. Instead, on March 8, 2011, the case was reassigned to Judge Katz and a copy of the *Brent* settlement agreement and injunction against parallel litigation was entered on the mistaken belief that the Court had jurisdiction over two other related cases (*Brent* and *Franklin*).

As this Court has ruled, there is no subject-matter to support any court action in *Brent* since removal by a counter-claimant and counter-defendant is not allowed by law. (*Brent* Doc# 156).

The Court, likewise, did not have jurisdiction over *Franklin* since a court loses jurisdiction once an appeal is filed. The Sixth Circuit recently nullified another Northern District of Ohio court's order "… because the order followed a notice of appeal that divested the court of its jurisdiction." See *United States v. Williams*, 2006 WL 3203748, 5-7 (6th Cir. 2006) (see also

---

[1] Encore 10-K, available at http://phx.corporate-ir.net/phoenix.zhtml?c=115920&p=irol-SECText&TEXT=aHR0cDovL2lyLmludC53ZXN0bGF3YnzaW5lc3MuY29tL2RvY3VtZW50L3YxLzAwMDExOTMxMjUtMTEtMDM1MjkzL3htbA%3d%3d, p. 17, ¶ 3

I. B, *supra*.). It is "settled law that filing a notice of appeal with the district court divests the district court of jurisdiction to act in a case". *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.*, 71 F.3d 1197, 1203 (6th Cir. 1995);*United States v. Smith*, 5:06-CR-00310-001, 2007 WL 4189469 (N.D. Ohio Nov. 19, 2007) aff'd, 319 F. App'x. 381 (6th Cir. 2009)

The parties indicated in the settlement agreement, in the order of preliminary approval and especially in the notice to the class that *three* related cases were involved in the settlement when in fact there was only one – *Vassalle* – and that case had barely begun. The parties highlighted the *Brent* case as a basis to demonstrate the case had been fairly litigated and developed to a point that an informed settlement could occur. This was mistaken. *Brent* Class counsel acknowledge the weakness of  its position and filed *Vassale* as a way to avoid their failure to inform the Court of its lack of jurisdiction for a settlement (since the Court did not have jurisdiction over *Brent* or *Franklin*).

*Vassale* was apparently filed to effectuate the settlement since *Franklin* had been dismissed shortly after filing, and *Brent* was inappropriately removed.  There had been no significant development of the determination of the merits or value of the case in either *Franklin* or *Vassale*. Even if *Brent* had properly been before the Court, its history of an Ohio-only class certification, summary judgment of a violation of the FDCPA but a holding of no actual damages, distinguishes the *Brent* claims from the rest of the class members. The failure of the *Brent* counterclaimants to name Encore as a defendant severely undercut any chance at significant FDCPA statutory damages.

At the time the Court entered the order of preliminary approval, the Court had jurisdiction over *only one case*: *Vassalle*. The Court currently has jurisdiction only over two cases (*Vasssale* and *Franklin* which, as of May 31, 2011, was remanded for the limited purposed of joining in

2

settlement of related cases[2]) involved in the settlement, neither of which is representative of the class members bound by the settlement. The order dismissing the *Franklin* claims has not been vacated. The settlement agreement has not been filed in either *Vassalle* or *Franklin*, for class member review.

## A. *Vassalle*

The *Vassalle* case was filed January 17, 2011. The final settlement agreement was entered sometime before February 14, 2011, and the written agreement was signed March 11, 2011. No answer has been filed. In *Vassalle*, the Plaintiff did not make any claim of a violation of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (hereafter "FDCPA"). Therefore, there are no claims for statutory damages. Considering Encore's net worth, up to $500,000.00, statutory damages would be available, which is a significant amount of money for a *statewide* FDCPA class case. Those damages are not available since neither *Franklin* nor *Vassalle* plead the FDCPA. The claims made in *Vassalle* are for common-law misrepresentation, negligence[3] and unjust enrichment. Those claims do not lend themselves well to class certification (or survival of a motion to dismiss) because for misrepresentation, reliance of each individual class member must be shown, while negligence involves unique factual questions to the extent the cause of action exists at all, and unjust enrichment would require proof that the debt was not owed. These common law claims do not carry with them the $500,000.00 in statutory damages available under the FDCPA. *Vassalle* is not representative of the claims of the

---

[2] Remanded on Clerk's order pursuant to Joint Motion.
[3] Negligence requires a determination of the reasonableness of the defendant's actions. The FDCPA is not simply a federal codification of common-law negligence. Rather, each section specifies what kind of conduct supports FDCPA liability. *Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507, 1516 (9th Cir. 1994).

class members which *Vassalle*'s parties have attempted to join to them by class settlement.

## B. *Franklin*

The *Franklin* case was dismissed on October 6, 2010. No answer has ever been filed. *Franklin* was dismissed based on a failure to plead and prove the element of reliance necessary to sustain the Ohio common law misrepresentation claim. *Franklin* was dismissed since the Court did not have subject-matter jurisdiction based on the existence of an agreed provision for binding mandatory arbitration. *Franklin* Doc# 18. On October 22, 2010, the Plaintiff appealed to the Sixth Circuit Court of Appeals.

The Sixth Circuit recently nullified another Northern District of Ohio court's Order granting a defendant a new trial because the Order followed a Notice of Appeal that divested the Court of its jurisdiction. *See United States v. Williams*, 2006 WL 3203748, 5-7 (6th Cir.2006). In *Williams*, the Sixth Circuit made clear that a district court loses jurisdiction upon a party's filing of a notice of appeal to the Sixth Circuit: "[i]t is indeed 'settled law that filing a notice of appeal with the district court divests the district court of jurisdiction to act in a case, except on remedial matters unrelated to the merits of the appeal.'" *Id*. (quoting *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.*, 71 F.3d 1197, 1203 (6th Cir. 1995)). Thus, "expansion of a district court's judgment [is] not permitted while an appeal is pending." *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987). This general rule applies "unless that appeal is untimely, is an appeal from a non-appealable non-final order, or raises only issues that were previously ruled upon in that case by the appellate court." *Rucker v. United States Dep't of Labor*, 798 F.2d 891, 892 (6th Cir.1986); *United States v. Smith*, 5:06-CR-00310-001, 2007 WL 4189469 (N.D. Ohio Nov. 19, 2007) aff'd, 319 F. App'x. 381 (6th Cir. 2009). Thus, when the

notice of appeal was filed in *Franklin*, the Court lost jurisdiction over matters related to the merits of the appeal.

## C. *Brent*

This Court has determined that it lacked subject-matter jurisdiction since a case cannot be removed from State Court based on a counter claim. All actions taken by this Court in that matter are void.

## D. *Encore, Midland Credit Management, Midland Funding*

The Encore entities most often file State Court collection matters in the name of Midland Funding, LLC. Midland Funding has no employees, and is 100% owned by Midland Portfolio Management. Midland Portfolio Management, in turn, is 100% owned by Midland Credit Management ("MCM"). MCM is 100% owned by Encore Capital Group, a publicly traded company.  In addition, MCM claims to have a "servicing agreement" which MCM uses to claim the right to complete control of all of Midland Funding's State Court collection litigation. MCM is a licensed collection agency regulated in many states. All of the false affidavits used in State Court collection actions were signed by MCM employees following the MCM procedures.

The status of MCM as a debt collector is an important consideration in the settlement, because 1) state laws vary regarding the regulation of debt collection companies and 2) many state laws provide additional (to both the FDCPA and common law) remedies and greater protection to the consumer to be applied in addition to the FDCPA remedies. 15 U.S.C. § 1692n. Of course, in this case, once a proper analysis of the Court's jurisdiction is applied, there is not even a claim under the FDCPA being made to support this settlement. Neither *Vassalle* (nor even

5

*Franklin*) made a claim under the FDCPA (jurisdiction is being claimed under the CAFA limited jurisdiction doctrine).

## II.  Encore's Superior Bargaining Position to *Vassalle* Consumers

Even with *Brent* in this case, the consumers' position was presented from a position of weakness. This Court granted Summary Judgment to a class it certified for Ohio. But the Court also ruled against actual damages. *Brent* presented only emotional distress as alleged damages rather than the more substantial actual damages that are available and have been plead in the other cases filed in Washington, Virginia, and California. Once actual damages were rejected for the Ohio class, that left only statutory damages under the FDCPA for the class members to be able to receive *any* recovery. The problem "*Brent*" faced was that the plaintiffs named only Midland Funding and Midland Credit Management (the only "related" case to even plead the FDCPA). Since Encore Capitol Group, Inc. was not included as a party, it is likely that MCM and Midland Funding argued a very limited net worth. The *Brent* consumers also faced the weakness of not properly being in Federal Court. The Court lacked subject-matter jurisdiction to provide any remedy. The same was true in *Franklin*. That left only *Vassalle* before the Court at the time of settlement, a case filed late in the settlement negotiations with weak or non-existent causes of action (with no available statutory damages) and no actual damages (if the Court is consistent with its determination in *Brent*).  Such a limited result or recovery was likely to affect the claim of attorney fee putting undue pressure on class counsel to settle short.

## III. Midland's Forum Shopping

Theodore Seitz is one of the attorneys defending in *Gray* in EDWA and also an attorney

defending *Vassalle* (and *Brent* and *Franklin*) in Northern District of Ohio. He is in a position to determine with whom he will enter into settlement negotiations. All of the negotiations in *Vassalle* (actually *Brent* before *Vassalle* was filed) were done without any notice, without any knowledge, and without any input by the *Gray-Lauber* Eastern District Washington Counsel. In *Gray*, the Defendants stipulated to a net worth of more than Fifty Million Dollars ($50,000,000.00) making statutory damages of $500,000.00 available for Washington residents. (Approximately $62.50 per person; $500,000.00/8,000 class members = $62.50 per class member). 15 USC 1692k(a)(2)(B). In addition, the Washington Plaintiffs have plead actual damages (other than emotional distress) and Washington law includes a disgorgement provision stripping all of the state collection claims of all interest, collection attorney fees, and other costs. RCW 19.16.450. In short, the Washington consumers rejected any nationwide settlement since their claims involve both federal law with statutory damages and Washington State specific laws with additional remedies and protection from the use of these false affidavits.

The Encore parties used their superior bargaining position to effectuate a settlement with an Ohio group of cases that suffered from jurisdictional issues and weak remaining causes of action already rejected by this Court.

### IV. The Settlement Inadequately Addresses Issues of the Encore Scheme

The Encore parties have revealed[4] to this Court only a part of their scheme to defraud consumers and court. They have made it to appear that the lack of personal knowledge of the MCM employee affiants was a mere oversight-the result of inadequate training and procedures-which can be easily corrected. In fact, the problem is much more severe. In addition to the affiant

---

[4] In the void proceedings in *Brent*.

not having personal knowledge, there is no way for the MCM employee or MCM to even be able to obtain the information or proof necessary to lawfully sustain a State Court collection action. Adequate records are simply not available to them. Developing a program and procedure of lying to the State Courts is necessary to collection by Encore because of the nature of the distressed, defaulted, nonperforming, generally stale-dated debt they buy for pennies on the dollar. This is not a situation where a company has simply failed to train employees to spend the time to check the records. The records that come with the electronic portfolio of debt are so inadequate that only a misrepresentation to the State Court would enable the entry of a judgment. The false affidavit of collection fills the hearsay gap and lack of proof of the debt or ownership of the debt "hole" in the collection case.

This settlement does not adequately address the problem of over a million false affidavits filed, to obtain millions of judgments against, unsuspecting consumer in courts that were wholly mislead by the process. There is no declaratory judgment declaring the affidavits false and unreliable which would support state court actions to vacate the judgments by the various attorneys general or private attorneys. By MCM affiants' and the collection mill attorney's sworn admissions, this is a deliberately planned and carefully executed scheme to defraud State Courts in collection actions. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 245-46, 64 S. Ct. 997, 1001, 88 L. Ed. 1250 (1944) (vacate judgment under the inherent power of the court when by "sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals"). The less than $10.00 payment is insufficient to support the necessary effort.

A credit card or other collection action requires proof of the elements of a breach of contract action. Those elements include the existence of a contract, performance by the plaintiff,

breach by the defendant, and damage or loss to the plaintiff. See 2 Ohio Jury Instructions (1993), Section 253.01, at 111-112. *See, also Am. Sales, Inc. v. Boffo*, 71 Ohio App.3d 168, 175, 593 N.E.2d 316, 321 (1991) (elements required for effective pleading of breach of contract action). In the case of an assigned claim, the Plaintiff (in the collection action) must also prove ownership of the debt. As shown in the hotly contested *Gray* collection action in Washington, the Encore entities can not meet these burdens if properly contested. Even when allowed two and one-half years of litigation to try to prove ownership and existence of the debt. Encore-Midland failed to do so. But in an overwhelming majority (over 90%) of these collection cases, the judgment is entered by default. The Encore entities fool state courts with affidavits which appear regular on their face and which appear to have attachments which would support their claim for both ownership of the debt, the existence of the debt, and the amount of the debt(contract damages). But this is a well orchestrated, well planned charade, a scheme designed by Encore to persuade state courts that they have proof of ownership of the debt, proof of existence of the debt, and proof of the amount. The deposition testimony shows the MCM affiants swear to these things but that they are 1) not true (see *Gray* state court collection action decision) and 2) not within the knowledge or ability to know of the affiant.

There is another related, even more pervasive, fraud on the court perpetrated by the collection mill attorneys at the direction of the Encore entities which should not be released by this settlement even if it is approved. The state court is lead to believe that all of the documentation attached to MCM affidavit was attached by the MCM affiant. Courts ought to be entitled to presume that if documents (what Encore entities call "media") are attached to an affidavit, that the affiant is authenticating the documents and establishing themselves as a records custodian for these documents to avoid the hearsay nature of the media (credit card statement,

assignments and bill of sale, credit card terms and conditions). But deposition testimony has shown that the collection mill attorneys, rather then the affiants, attach the media. The affiant has no knowledge of what documents are later attached by lawyers they do not even know. In other words, the lawyer for the Encore entities chooses what evidence to present to the court and pretends that it is coming from the MCM affiant –when it is not.

Credit card issuers and third party debt buyers have over the last few years been "squirting cider" in the ears of the court system. Over the last five years, the number of consumer credit actions brought in the New York City Civil Court has averaged about 270,000 filings a year. Of that number almost 66.7% result in default judgments being entered against debtors. Of the 33.7% of consumers who do answer the complaints, in excess of 95% are unrepresented by counsel. Consent orders vacating many of these judgments have been negotiated owing to these proven abuses. *Am. Exp. Bank, FSB v. Dalbis*, 30 Misc. 3d 1235(A) (N.Y. Civ. Ct. 2011).

Debt Buyers' Association ("DBA") is a tax-exempt trade organization incorporated in California with approximately 550 members. These members are debt buyers: companies which are in the business of purchasing and collecting delinquent consumer loans and receivables.  *Id*. Rather than originating loans themselves, Debt buyers generally purchase portfolios of consumer loans and receivables that have been in default for a significant period of time at a discount from lending institutions. To recoup a portion of its lost investment, an originating lender may sell a charged-off consumer loan to a debt buyer, usually as part of a portfolio of delinquent consumer loans, for a fraction of the total amount owed to the originating lender.  Relevant to the present case is that, as a matter of practice, debt buyers generally have received only the aggregate amount of the charge-off from the originating lender for a particular debtor and consequently do not know the component amounts of stated principal, unpaid accrued interest, late fees, and other

charges. *Debt Buyers' Ass'n v. Snow*, 481 F. Supp. 2d 1, 4 (D.D.C. 2006).

Portfolio sales agreements specifically disavow reliability of information. Encore avoids

filing these sales agreements because of the disclaimer that would contradict the MCM affiant,

deliberately concealing Encore's inability to prove ownership or amount of the debt. For

example, in a suit for misrepresentation by a debt buyer against a debt seller, the court

acknowledged that the debt was sold with a disclaimer as to the accuracy of the electronic

information (the only information) used to transfer the debt. *Summit Recovery, LLC v. Credit

Card Reseller, LLC*, CIV.08-5273(DSD/JSM), 2010 WL 1427322 (D. Minn. Apr. 9, 2010). In

*Summit Recovery*, the court observed:

> The contract, however, expressly stated that the sale of the Portfolio was not
> contingent on CCR's representations. For example, the contract states that,
> **"[s]eller does not represent, warrant, or insure the accuracy or
> completeness of any information or its sources of information contained
> in the information provided or in any of the Account files," and "[b]uyer
> ... is not acting in reliance on any representation made or information
> furnished by the Seller." (Diebold Dep. Ex. 5 at § 7.1 .) Furthermore, the
> parties agreed that the Portfolio was sold "as is" and that CCR did not
> "REPRESENT, WARRANT OR COVENANT THE NATURE,
> ACCURACY, COMPLETENESS, ENFORCEABILITY OR VALIDITY
> OF [the Portfolio]."** (Id. § 7.8 (emphasis in original).)

*Summit Recovery, LLC,* 2010 WL 1427322. In *Gray*, the sales-agreement disclaimer stated that

the seller to Midland did not represent that the seller owned the debt it was selling or represent

the debt itself existed. Midland knew at the time of purchase of the debt, for 3 cents on the dollar,

that it did not have any proof that it owned the debt it just bought (since the seller disclaimed

representation ownership or existence of the debt). Encore developed a scheme of false affidavits

with the attorneys attaching documents to overcome the deficiency in evidence that comes with

extremely-low-priced debt portfolios.

This settlement does not even address the practice of the affiant never seeing the records

that the affiant is supposedly authenticating. This conduct should be excluded from this settlement even if it approved. The *Gray* plaintiffs believe that a significant reason for the settlement was to avoid *Gray* exposing this practice to the state and federal courts. A hearing for class certification was cancelled because this settlement was reached mere days before that hearing before Judge Shea.

The records are attached by the collection mills in distant forums without the knowledge or permission of the affiant (but allowed and encouraged by the MCM corporation). While not addressing this practice, the *Vassalle* settlement releases MCM from this practice. The claim is not only lack of personal knowledge, not only misrepresenting in the affidavit the specifics of the debt (amount owed, interest rate, total due, date of default) but also the shocking practice of allowing a collection attorney in some distant state (like Washington) at some later time to attach whatever that collection attorney employee chooses to someone else's affidavit. Encore has not bargained for a release form this practice and should not be released. In Ms. Gray's case, Tu Uyen Huyhn (a non-high school graduate employee of Suttell & Hammer, P.S.) testified *she* (not the MCM affiant) selected what "media" should be attached to Ms. Neu's affidavit. (*Gray* Doc. # 250-1, *Dep. Huynh*, pp. 37-42). Ms. Neu confirmed at deposition she never saw the media. (*Gray* Doc. # 179-1).

### A. *MCMI Affiant Elizabeth Neu*

In *Gray v. Suttell, et al*, (2:09-cv-00251-EFS (EDWA)), Ms. Neu herself testified to the following:

> Q. …[C]an you describe for me what information is in Midland Credit Management's database?
> A. No. I do not have that information.
> Q. Okay. Did you ever see the information that was in Midland Credit Management's

database --
A. No.
Q. -- at any time?
A. No.
Q. Okay. So how would you know then what information was in Midland Credit Management's database?
A. I trusted that the information that was sent to me was true and accurate.
Q. Okay. And what information was … sent to you?
A. In the affidavit that came.

*Gray* Doc. # 250-1, *Dep. Huynh*, pp. *21-22)*

Q. … Do you know how Midland Funding LLC became the owner of and/or successor to the obligation sued upon?
A. No, I don't.

*Gray* Doc. # 179-1, *Dep. Neu*, pp. *21-22,* ll. 3-6

Q. Up until and including today have you ever read the affidavit all the way through?
A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, p. *24,* ll. 13-16

Q. …Who was reporting to you in August of 2008?
A. No one.
Q. Do you know the name of the person who hired the attorney to represent Midland Funding LLC?
A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, p. *33,* ll. 6-8

Q. At the time you signed the affidavit did you know whether the debt was delinquent?
A. Midland Credit had all that information.
Q. Okay. Would it be fair to say that you had no personal knowledge of whether --
A. No personal knowledge.
Q. -- that debt was delinquent or not?
A. (No response.)
Q. Can you answer the question?
A. No personal knowledge.

*Gray* Doc. # 179-1, *Dep. Neu*, p. *36,* ll. 1-11

Q. When you worked for Midland Credit Management did you look at the interest rates before you signed these affidavits?
A. No.

Q. And would you take any measures to independently verify that the numbers were correct other than just looking at the affidavit?
A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, pp. *42,* ll. 18-25

Q. Did you ever know how calculations were performed as required by the Federal Truth in Lending Act?
A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, p. *43,* ll. 1-2

Q. …When you signed the affidavits and before you put them in the envelope did you ever attach anything to them?
A. No.
Q. Was it just the affidavits that you put in the envelopes?
A. Yes.
Q. Okay. Did you review any of the Midland Credit records before you signed the affidavit?
A. No.
Q. And did you review any other documents before you signed the affidavit?
A. No..

*Gray* Doc. # 179-1, *Dep. Neu*, pp. *62,* ll. 19-25

Q. …So would it be fair to say that the affidavit could have said almost anything and you would have signed it?
…THE WITNESS: We -- we just trusted Midland Credit's database and felt no need to review the affidavit.

*Gray* Doc. # 179-1, *Dep. Neu*, p. *64,* ll. 11-18

Q. …Now to your knowledge did you ever have the title of *"Specialist"*?
A. Not to my knowledge, no.
Q. Okay. And then it says, *"I am a custodian of records for Midland Credit Management, Inc."*…Based on your definition do you think today that you were a custodian of records in 2009?
A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, pp. *84-85*

Q. In 2009 what did you know about the recordkeeping systems of Midland Credit Management?
A. Just that I believed they were true and accurate. I never saw them.
Q. Did you have any idea in 2009 what the records consisted of?

A. No.

Q. Did you have any idea in 2009 how Midland Credit Management obtained the records?

A. No.

Q. Okay. And in 2009 did you have any understanding about what the recordkeeping systems were for Midland Funding LLC?

A. No.

Q. Did you have any understanding of what records were kept by Midland Funding LLC --

A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, p. 87, ll. 6-25

    Q. In the entire time you worked at Midland Credit Management did you ever see a statement attached to any affidavit?

A. No.

Q. In the entire time you worked at Midland Credit Management did you ever see a cardholder agreement or original contract attached to an affidavit?

A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, pp. 93, ll. 18-25

    Q. Did you ever retain any of those individuals [the Suttell Attorneys] on behalf of Midland Funding or anyone else?

A. No.

Q. Did anyone reporting to you retain any of those individuals on behalf of Midland Funding or anyone else?

A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, p. 99, ll. 7-13

    Q. …[H]ave you ever, in any case, been a custodian of records for Midland Credit Management?

A. No.

Q. Have you ever in any case or under any circumstances ever had personal knowledge of the recordkeeping systems maintained on behalf of Midland Funding?

A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, p. 99, ll. 1-2

    Q. Have you ever under any circumstances been familiar with the manner and method by which Midland Credit Management creates and maintains its normal business books and records?

A. No

15

*Gray* Doc. # 179-1, *Dep. Neu*, p. *100,* ll. 11-15

> Q. Do you now or have you ever had any knowledge under any circumstance regarding whether the records of Midland Credit Management are kept in the regular course of business?
> A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, pp. *100,* ll. 18-22

> Q. Do you now or did you at any time in the past ever have any knowledge of the relevant financial information concerning any of the Midland Funding or Midland Credit accounts?
> A. No.
> Q. Do you now or did you at any time have any knowledge regarding agreements that a customer had made with an original creditor before it came to Midland Credit or Midland Funding?
> A. No.
> Q. Do you now or did you at any time in the past regarding any of your -- the affidavits that you signed have knowledge of whether any defendant used or authorized the use of a credit card account?
> A. No.
> …
> Q. Do you now know or at any time did you -- in the past did you know whether any defendant failed to make a payment on an account?
> A. No.
> Q. Did you at any time know whether Midland Credit Management or Midland Funding had demanded payment from a defendant?
> A. No.
> Q. Do you now or did you ever have any knowledge regarding how the attorneys representing Midland Funding or Midland Credit Management were retained?
> A. No.
> Q. So if you were called to testify as a witness in a case against Kelli Gray could you testify as to any of the facts regarding her account at Midland Credit Management or Midland Funding?
> A. No.

*Gray* Doc. # 179-1, *Dep. Neu*, pp. 102-103

### B. *Tu Uyen Huynh Excerpts – Attaching Documents to Affidavits*

Tu Uyen Huynh describes the process of attaching the documents to the Neu Affidavit, referred to as the client affidavit, in the following testimony:

16

Q. And how would you go about making sure you have what you described as media?

A. Well, first off I would go through the notes, and typically the client affidavits, when we received it would -- there would be a note in there saying that we have the client affidavit.

Q. Indeed.

A. And I would go through to make sure that we have bill of sale, we have billing statements and things like that.

Q. Now, how physically would you do that task?

A. These would be imaged in the files itself.

Q. Okay. And then when you find that image in the file you would print it out?

A. Yes, correct. Aside from the client affidavits. Client affidavits, we keep them separate, and I would actually pull them out myself.

Q. Okay. But it was up to you to find the client affidavit, match it to the Gray file?

A. Yes.

Q. Okay. Is there -- match it to the Gray file because it says Gray's name on it, correct?

A. Correct.

Q. You would go on -- into the computer system, locate what you believe to be the correct bill of sale and print that, correct?

A. Correct.

Q. You would go on the computer system, locate what you thought to be the correct credit card terms and conditions, and select that and print that?

A. Correct.

…..

Q. … you would go on into the computer system and select what you believe to be the correct credit card statement, in this case presumably Spiegel, if you look at Exhibit 1, Page 9, correct?

A. Right.

Q. You would select and print that?

A. Correct.

Q. Okay. Then you would take the client declaration from one file, you would take the bill of sale you had printed, the Spiegel statement you had printed in Exhibit -- again, we're looking at Exhibit 1, Page 5 and 6, you would get that client affidavit from one file, correct?

A. It's not a file, it's a drawer system that we have. We put away the affidavits –

Q. Okay.
A. -- so it won't be lost.

Q. All right. So you go to that drawer and find the original of the affidavits and you would pick that up, and you would pick up several at a time, wouldn't you, generally?
A. Yes.

Q. Okay. And then you would pick up the bill of sale, if you look at Exhibit 1, Page 7 that you printed out, correct?
A. I don't pick that up, I -- it's actually imaged specifically to the account, so it's in the account itself.

Q. Okay. But you need a paper one to send to the court?
A. Yes, I print it out.

Q. Right. And then you pick it up once you print it out?
A. Yes.

Q. Okay. I'm being very simplistic but I want to be clear. So you send it out –
A. Oh, I have a printer at my desk so I don't have to go anywhere to pick it up.

Q. Okay. So you reach onto your printer and you pick up the bill of sale, you pick up the Spiegel charge that you've selected and printed, and you pick the First Consumer National terms and conditions you selected and printed. And you take all of those documents, you attach them to the other documents you've already described, the note for hearing, the motion and declaration for default that's part of Exhibit 1, the judgment and so forth, and you then would carry that with perhaps 20 to 30 others to Karen Hammer or whichever attorney was assigned at that time, correct?
A. Yes, correct.

*Gray* Doc. # 250-1, *Dep. Huynh*, pp. 37-42

Ms. Huynh goes on to testify about her knowledge regarding how the attached documents

are created and where they come from:

Q. (BY MR. KINKLEY) If you look at Exhibit 1, Page 7, ma'am, and is there anything in there that would lead you to believe that that page, that bill of sale which consists of Pages 7 and 8, would have anything whatsoever to do with Kelli Gray?
A. Not Kelli Gray herself, but in this case it would be to the account.

Q. Okay. Is there anything in there that tells you that that bill of sale relates in any

way to an account of Kelli Gray's?

A. Again, not to Kelli Gray specifically, but to this account because it was transferred from Spiegel to Midland.

Q. What account?

A. The -- I guess the Kelli Gray account.

Q. Okay. Where in here does it tell you or lead you to believe that this bill of sale has anything whatsoever to do with the Kelli Gray account? Can you tell by looking at this?

A. Well, I base it off of the billing statement because it was Spiegel and so it -- it was transferred and conveyed over to Midland, so that's the connection that I see there.

Q. Okay. So you assume since in the -- since you were able to locate a Spiegel charge for Kelli Gray, that you just assume that the bill of sale, since it also mentions Spiegel, applies to Kelli Gray?

A. Yes.

Q. Okay. But you have no other information that this bill of sale applies to Kelli Gray when you select it as a part of your media, do you?

A. I actually didn't select it, there was only one bill of sale on the account so we didn't have many for me to choose from.

Q. And when you say "one bill of sale on the account," what do you mean by that?

A. Meaning that if you were to go into this specific account, the bill of sale and the billing statement would be in imaging for me to use. And so if you were to open that up you would only see that there's only one bill of sale and one billing statement.

Q. All right. And who put that bill of sale as an image into the Kelli Gray account?

A. Another legal assistant.

…

Q. Okay. But you have no information of as to who sends a bill of sale to Suttell in any particular case, do you?

A. I don't deal with the documentation from the clients, I don't receive them, so I would say no.

Q. All right. So you don't know whether that indicates receipt of image of bill of sale from Midland Funding, do you?

A. No, I don't.

….

Q. (BY MR. KINKLEY) You have no idea of the source of that document, do you?

A. No, I don't receive -- I don't deal with these.

Q. Okay. You have no idea of the source of Exhibit 1, Page 9, the Spiegel -- so-called Spiegel charge statement, do you?
A. Again, I don't receive these so I don't know.

Q. And you have no idea of the source?
A. I would assume it's our client, but again, I don't know.

Q. You have no idea of whether it's accurate or not, do you?
A. Whether the information is accurate or –

Q. Yes, you have no idea whether Exhibit 1, Page 9 contains accurate information or not? You don't personally know that?
A. Correct.

Q. Okay. You don't know how Exhibit 1, Page 9 was prepared, do you?
A. No, I do not.

*Gray* Doc. # 250-1, *Dep. Huynh*, pp. 52-57

C. *Testimony of Principal and Shareholder Attorney Karen Hammer of Washington Collection Mill Law Firm Suttell & Hammer, P.S.*

The following is some of the testimony of collection attorney Karen Hammer, principle

shareholder of Suttell and Hammer, P.S. (Encore's Washington collection mill attorneys):

Q. Right. And Elizabeth Neu is not authenticating the Spiegel charge statement, is she?
A. No.

Q. Okay. Spiegel -- Elizabeth Neu is not suggesting that the Spiegel card statement is accurate because it's not even attached to her affidavit when she signed it, was it?
A. I've already answered that question.
…

Q. I know, but I'll ask it better, I'm sorry. I really can ask it better. You're not saying that Elizabeth Neu – when you filed this default package with the court, you're not suggesting to the court that Elizabeth Neu has suggested that the Spiegel charge statement is a record that the court should consider? Elizabeth Neu is not saying that, is she?
A. No.
…

.

Q. The point is, the Spiegel charge statement is being attached to the default package by Suttell employees, right?
A. Yes.

Q. Elizabeth Neu has nothing to do with that, does she?
A. Again, I think I've answered this question now five times, so, no.

Q. Okay. Elizabeth Neu, a Suttell employee, attaches Exhibit 1, Page 10 to the motion for default, right?
A. Right.

Q. Elizabeth Neu has nothing to do with attaching First Consumers Exhibit 1, Page 10 and 11 to the default package, does she?
A. No.

Q. It's not attached to her affidavit when you receive it, right?
A. I've already answered this question several times.

Q. Just bear with me.
A. No.

Q. Okay. Elizabeth Neu doesn't know whether or not you're attaching the First Consumers statement or the Spiegel statement to the default package, does she?
A. I'm not attaching anything to her affidavit, I'm including it in the default packet.

Q. And she doesn't know whether you do that or don't do that, does she?
A. No.

Q. And she doesn't know what you attach to your default package or not relative to -- correct?
A. Correct.

Q. Her affidavit is her affidavit and that's it, right?
A. Right.

Q. There's no attachments?
A. Correct.

Q. She's not suggesting that there are any attachments because when she signs it there aren't, correct?
A. Correct.

Q. And she doesn't know if you do or if you don't ever attach anything to the default package that you file?
A. Correct.

*Gray v. Suttell/Midland,* United States District Court, Eastern District of Washington Case No.: CV-09-0251-EFS, Doc. # 249-1, pp. 29-31 (Transcript pp. 113-115).

## V. The release is broader than the Court's interpretation of the Injunction.

This Court observed that "Herring is concerned about the filing of the claims against third parties, such as local "collection mill" law firm's that uses a fraudulent affidavit prepared by Midland in state court will be barred". (Doc # 8; *Brent* Doc #156).  The Court then ruled that "the Court hereby clarifies that its injunction does not apply to persons or entities that are not affiliated with Encore or Midland." *Id.* Judge Shea in EDWA ruled that Gray's case could go forward against the Suttell defendants (the Washington state attorney collection mill) for the false collection affidavits. Despite Judge Katz's above ruling Encore has now argued to Judge Shea that the release in "*Brent*" (now *Vassalle*) is a get out of jail free card for the collection mill attorneys. This Court should not release the Encore entities for the additional scheme of falsely presenting what they represent as "evidence" (media) to the court as though it was a part of the affidavit. Vicarious liability is applied to the FDCPA. "Congress intended the actions of an attorney to be imputed to the client on whose behalf they are taken." *Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507, 1516 (9th Cir. 1994). Ms. Gray should be allowed to continue her well litigated case (355 documents filed so far) against both the collection mill and the Encore Defendants together.

Ms. Gray is handicapped by the release in this settlement. She can continue to pursue her action against the collection mill attorneys for the use of the false MCM affidavits and for the scheme of attaching "media" to defraud the courts but maybe not against the principal and developer of the scheme, signer of the affidavits, Encore (by an MCM employee). And it is unclear from the language of the release whether the acts of allowing the media to be attached to

22

a MCM affidavit (without the affiants knowledge) is included in the release since this conduct is not strictly based on the false affidavit but rather another overt act of fraud on the court done by the collection mill attorneys, but with the agreement and on behalf of Encore.

## VI. Gray's Journey through the State and Federal Courts

The Encore entities and class counsel has tried to portray the *Gray* matter as a "copy cat" case designed to piggy-back on the work of class counsel. Nothing could be further from the truth. Gray's counsel has been presenting to other attorneys at MCLE's on the issue of debt buyer's false affidavit and other practices for years, including seminars attended by *Vassalle*'s class counsel. Over 350 documents have been filed in the *Gray* federal case.

On February 4, 2011, over *two and a half years after being filed*, in the State of Washington, Spokane County Superior Court Judge Jerome Leveque, dismissed Midland Funding, LLC's collection case against Kelli Gray. Midland Funding, LLC was given every possible opportunity to prove that 1) it owned the debt 2) that she owed a debt and 3) that they could prove what was owed. Judge Jerome Leveque determined that:

> Ms. Neu's declarations are obviously lacking foundation reliability and credibility; are not based on personal knowledge and cannot stand.
>
> Mr. Minford's declaration is also based on legal and conclusionary statement without a foundation to support those assertions.
>
> The Court agrees with defendant's argument that the declarations are attempting to support factual assertions and legal conclusions with hearsay and frankly not much else. Legal conclusions, of course, are likewise not admissible and the entire declaration lacks credibility and reliability.

See *Gray v. Suttell/Midland,* United States District Court, Eastern District of Washington Case No.: CV-09-0251-EFS, Doc. # 210-1, pp. 1-2 (copy of Judge Leveque's state court Order authenticated and filed for judicial notice in the federal action).

Kelli Gray incurred over $26,000.00 in costs and attorney's fees[5] defending the Midland collection action. Midland-Encore was armed with the false affidavit of Elizabeth Neu and later other Midland employees following the same practices and procedures filed as late as January 18, 2011 (ignoring this court's September 2009 injunction).  Ten Dollars ($10.00) does nothing for the 1.8 million victims of Midland Funding, LLC's false affidavit factory. Paying three cents on the dollar does not buy one the proof necessary to prove a debt in court, so Midland affiant's just make it up. It is easy and cheap for the Midland-Encore affiants to sign 200-600 affidavits a day. It is hard and expensive for an alleged debtor to disprove it. Ten Dollars is an insufficient amount to compensate the loss.

Nothing in the settlement remedies the fraud perpetrated on the state court. Bringing a federal action in each state allows for a proving ground under the FDCPA where there are real remedies and attorney fees. The federal action then assists applying that information to the state court to negate Encore's misrepresentation of the ownership of the debt, the existence of the debt, or at a minimum the amount of the debt. The only effective way to fight a billion dollar a year debt collector/buyer like Encore is to be able to attack its false, deceptive, misleading and unfair practices in federal court with the FDCPA, the tool Congress created to protect consumers against false affidavits. 15 U.S.C. § 1692. None of the *Vassalle*, *Franklin*, or even *Brent* debtors made any effort to defend the state lawsuits against them, yet they get a benefit not allowed any class member, *i.e.*, dismissal of the collection action against them. The settlement takes away

---

[5]Judge Leveque's award of attorney fees to defendant Gray. This does not include the substantial attorney fees incurred in the federal action nor does it include the cost of the depositions taken in Minnesota, Seattle, Washington and Spokane, Washington as those were done in and charged to the federal case. The depositions were instrumental in negating and demonstrating the falsity of the Encore-MCM affidavits. Such a defense to the state action based entirely on false affidavit would be impossible without a federal action against the defendants which this settlement would deny class members.

from class members the federal FDCPA sword, which effectively denies them the collection-defense shield.

## VII. The Attorney Fees are Excessive and Not Documented

Pursuant to the local  rule requiring a good faith estimate of attorney fees, Class counsel, Mr. Murray, estimated its attorney fees (for the *Brent* class case) (if there was not a trial) to be Twenty Five-Thousand Dollars ($25,000.00). (*Brent* ECF No. 11, p. 1).  Mr. Murray estimated an additional $20,000.00 for trial for a total fee of Forty Five Thousand ($45,000.00).  *Id.* But in the settlement agreement, class counsel seeks 1.5 Million Dollars ($1,500,000.00). Class counsel has not produced any time records to support the award of attorney fees, and has not identified the basis for the claim to an award of fees. If it is a fee based on the equitable principle of a common fund, he has not identified the amount of the common fund, the percentage he is claiming nor the basis for that claim.

The order of preliminary approval of the settlement does not support the award of attorney fees. "The district court must provide a clear statement of the reasoning used in adopting a particular methodology and the factors considered in arriving at the fee. *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) ("It remains important ... for the district court to provide a concise but clear explanation of its reasons for the fee award."); *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). These mandates have not been met. There is no explanation of the basis for the fee or the considerations to support the exercise of the court's discretion.

In this case, the preliminary approval of the nationwide class settlement including especially the attorney fees was, at least in part, in consideration of class counsel efforts in *Brent*.

But *Brent* is not a part of this settlement and the failure to seek remand and inform the court of the absence of subject matter jurisdiction should not be rewarded.[6] The efforts in Brent should not be considered in the fees award.

What is left, after the *Brent* remand, is a case dismissed on motion before the answer (*Franklin*) and a case where only a complaint was filed (*Vassalle*). Considering the posture of the *Vassalle* and *Franklin* cases, the caution offered by the Sixth Circuit must be considered: "a percentage award may also provide incentives to attorneys to settle for too low a recovery because an early settlement provides them with a larger fee in terms of the time invested." *Rawlings*, 9 F.3d at 516 . There, the court explained:

> In assessing the reasonableness of requests for fees in class actions resulting in the creation of a common fund, a court must consider factors that are not present in statutory fee shifting cases. The interest of class counsel in obtaining fees is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class. In addition, there is often no one to argue for the interests of the class (that their recovery should not be unfairly reduced), since it is to be expected that class members with small individual stakes in the outcome will not file objections, and the defendant who contributed to the fund will usually have scant interest in how the fund is divided between the plaintiffs and class counsel.1 Task Force Report at 255 ("In these situations, the plaintiffs' attorney's role changes from one of fiduciary for the clients to that of a claimant against the fund created for the clients' benefit.").

*Id*.

There is no indication that class counsel presented any basis for an award of fees. The great danger is that a large attorney fee agreed and approved without support is incentive for class counsel to settle short for the class because the benefit is so great to the class counsel. There is often little opposition when each class member's stake is so small.

In *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000), the court held that:

---

[6] Particularly when this error of law was know to class counsel or at least applied by class

"both the lodestar and the percentage of the fund methods are available to
district judges in calculating attorneys' fees in common fund cases. Of course,
no matter which method is chosen, district courts should continue to be
guided by the traditional criteria in determining a reasonable common fund
fee, including: "(1) the time and labor expended by counsel; (2) the
magnitude and complexities of the litigation; (3) the risk of the litigation ...;
(4) the quality of representation; (5) the requested fee in relation to the
settlement; and (6) public policy considerations."

No information has been produced nor made available to class member of "the time and
labor expended by counsel". There has been no demonstration how the other factors are to be
applied to the limited litigation and lack of success in the *Franklin* and *Vassalle* cases that are the
only cases on which this settlement can be based. "Whether calculated pursuant to the lodestar or
the percentage method, the fees awarded in common fund cases may not exceed what is
"reasonable" under the circumstances."  *Id*. at 47.

In *In re Mercury Interactive Corp. Sec. Litig*., 618 F.3d 988, 994-95 (9th Cir. 2010) the
court explained:

During the fee-setting stage of common fund class action suits such as this
one, "[p]laintiffs' counsel, otherwise a fiduciary for the class, ... become[s] a
claimant against the fund created for the benefit of the class." *Class Plaintiffs
v. City of Seattle (In re Wash. Pub. Power Supply Sys. Sec. Litig*., 19 F.3d
1291, 1302 (9th Cir.1994) (internal quotation marks omitted). This shift puts
plaintiffs' counsel's understandable interest in getting paid the most for its
work representing the class at odds with the class' interest in securing the
largest possible recovery for its members. Because "the relationship between
plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts
have stressed that when awarding attorneys' fees from a common fund, the
district court must assume the role of fiduciary for the class plaintiffs." Id. As
a fiduciary for the class, the district court must "act with 'a jealous regard to
the rights of those who are interested in the fund' in determining what a
proper fee award is." Id. Included in that fiduciary obligation is the duty to
ensure that the class is afforded the opportunity to represent its own best
interests. When the district court sets a schedule that denies the class an
adequate opportunity to review and prepare objections to class counsel's
completed fee motion, it fails to fulfill its fiduciary responsibilities to the

counsel in other cases in ND.

class.

Class Counsel has not made a fee motion for the court to evaluate and has not offer the lodestar (reasonable hourly rate time reasonable number of hour expended) to compare the reasonableness of class counsel's fee. A detailed time statement should be produced. "It is the obligation of the district court to ensure that the class has an adequate opportunity to review and object to its counsel's fee motion and, potentially, to conduct discovery on its objections to the fee motion if the district court, in its discretion, deems it appropriate." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d at 995. The court further explains the requirements of federal Rule of Civil Procedure 23(h) that class counsel identify the fees and a means to evaluate the fees before the class notice is sent notice is sent:

> The plain text of the rule requires a district court to set the deadline for objections to counsel's fee request on a date after the motion and documents supporting it have been filed. The relevant portions of Rule 23(h) provide:
>> (1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. **Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.**
>> (2) **A class member**, or a party from whom payment is sought, **may object** to the motion. Fed.R.Civ.P. 23(h)(emp added).
> The plain text of the rule requires that any class member be allowed an opportunity to object to the fee "motion" itself, not merely to the preliminary notice that such a motion will be filed. In this case, although notice of the motion was provided to the class, class members were deprived of an adequate opportunity to object to the motion itself because, by the time they were served with the motion, the time within which they were required to file their objections had already expired.

*In re Mercury Interactive Corp. Sec. Litig*., 618 F.3d at 993-94.

## VIII. Settlement is Shockingly Low

"If $500,000 is less than one percent of Defendants Hawks' net worth, than each absent class member stands to recover a maximum of twenty-five dollars. Such an award is shockingly

low when compared to the statutory damages of up to $1,000 that each class member may be eligible to receive in an individual suit. *Sonmore v. CheckRite Recovery Services, Inc.*, 206 F.R.D. 257, 265 (D. Minn. 2001).

Recently, a Northern District of Ohio court recognized that small awards (*e.g.*, under ten dollars) is of no consequence to debtors. Judge Patricia Gaughan recently ruled in *Jerman v Carlisle, McNeil, Rini, Kramer & Ulrich, et. al.,* Case No. 1:06 CV-1397, Doc # 59, p. 20, on remand from the U.S. Court Supreme Court), "an award of a little over $3.00 to each class member… is difficult to conclude that it would actually be of any consequence to the recipients."

Encore is using this settlement to further its judgment debt collection practices. It is a well developed technique for a debt collectors (like Encore) to send a small check to a consumer to verify consumer's bank account information and addresses. Here, the claim form verifies the consumer's address and telephone number and once checks are sent Encore can identity the consumer's bank account from the deposit information on the back of the check. Debt collectors like Encore would pay (less than) $10.00 per person to verify address, telephone, bank account information to better enable Encore to collect the judgments it obtained by false affidavits. One "How To" book for "debt collectors" explains this technique, suggesting that the judgment creditor (like Encore-Midland) "write the judgment debtor a check … it is usually possible to identify the debtors bank from the stamp the bank placed on the back of the cashed check." Gini Scott, Stephen Elias, & Lisa Goldoftas, "Collect Your Court Judgment", Nolo Press, California 2nd Edition, Chapter 8, Section A.2., p.8-2 (1993), ISBN 0-87337-151-8. Even the payment to the class member is a benefit to Encore and illusory to the debtor[7].

---

[7] Encore's shareholders recognize the value of the shelter the settlement provides, since stock in Encore is up approximately 23% since the March 11, 2011 preliminary approval was announced.

A Washington class would net each member $62.50 pro rata class statutory damages, *plus* actual damages, perhaps trebled. In addition, disgorgement of all attorney's fees, interest, and costs (discussed *supra*.) is available: The Washington federal case is being done in conjunction with concurrent state court suits to vacate the judgments entered by Encore's fraud on the court.

## IX. Settlement Fails to Consider State Law Remedies

No where in the settlement agreement, the order approving the settlement, nor the notice to the class does it explain the basis for the damages of less than $10.00 per person. This Court rejected and dismissed the causes of action in *Franklin,* would likely reject those same causes of action made in *Vassalle*. Even if *Brent* were considered, this Court rejected actual damages and there has been no demonstration of the basis for the statutory damages. Neither *Vassalle* nor *Franklin* pleads the FDCPA. If *Brent* were a part of the settlement, and if statutory damages were implicated, then only the claims within one year would be included. 15 U.S.C. § 1692k(d). The class settlement makes no effort to make the distinction for those persons who would or would not be entitled to statutory damages.

Most states have laws regulating and providing remedies against debt collectors. Those remedies are in addition to the remedies of the FDCPA (if it were pleaded). *Franklin* and *Vasalle* involve only common-law claims and there has been no discussion of the remedies available under state law. The release is as broad as to appear to preclude class members' remedies under state law but no value has been added to each state's class members based on that state's laws.

The settlement does not consider the variances in state-law claims and remedies available to class members outside of Ohio. For example, in Washington a violation of the Washington Collection Agency Act ("WCAA") bars Encore from recovery of "any interest, service, charge,

attorneys' fees, collections costs, delinquency charge, or any other fees or charges otherwise legally chargeable to the debtor" since the false affidavit signed by MCM employees violates the WCAA prohibited practices section, RCW 19.16.250. RCW 19.16.450[8] [9]. This provides a substantial remedy for Washington consumer-debtors. More than One Thousand Dollars Five Hundred Dollars ($1500.00) is included in every Encore-Midland collection action in Washington. A "standard" attorney fee of $650.00 is charged for default and $850.00 for Summary Judgment. Because of the advanced age of the accounts, significant interest has accrued. Late fees have become excessive for credit cards. Washington consumers would each be relieved of all of these fees under Washington law, but for this settlement.

Washington common law recognizes that wrongfully held money must be disgorged. *See Mahler v. Szucs*, 135 Wash.2d 398, 430, 957 P.2d 632, 649 (1998), order corrected on denial of reconsideration, 966 P.2d 305 (1998)(awarding prejudgment interest for failure to disgorge wrongfully held money). The proposed settlement would allow the Encore Defendants to keep the wrongfully held money, and pay only ten dollars ($10.00). In Washington, the barred attorney's fees alone exceed 5.2 million dollars (over 8000 putative class members identified in the Gray case times a standardized fee of at least $650.00 always added by Encore and the Suttell, P.S. collection mill attorneys, equals $ 5.2 Million: 8,000 x $650 = $5,200,000.00).

Further, the Encore false affidavit violates the Washington Consumer Protection Act

---

[8]"If an act or practice in violation of RCW 19.16.250 is committed *by a licensee or an employee of a licensee in the collection of a claim*, neither the licensee, the customer of the licensee, nor any other person who may thereafter legally seek to collect on such claim shall ever be allowed to recover any interest, service charge, attorneys' fees, collection costs, delinquency charge, or any other fees or charges otherwise legally chargeable to the debtor on such claim: PROVIDED, That any person asserting the claim may nevertheless recover from the debtor the amount of the original claim or obligation." RCW 19.16.450 (emphasis added).

[9] MCM is a licensed collection agency in Washington.

("WCPA") (a violation of the WCAA, is also pre se violation of the WCPA). RCW 19.86; RCW

19.16.440.  The use of the false affidavit is also itself violation of the WCPA independent of the

WCAA. The WCPA permits treble actual damages up to $25,000.00 per instance. RCW

19.86.090.  Ms Gray incurred $26,000[10] dollars in attorney fee defending the state court

collection action based on the false affidavits. These are actual damages under the WCPA and

FDCPA. Attorney's fees of debtors defending a lawsuit on a false claim based on a false affidavit

in Washington may be recovered as damages in certain circumstances. *State ex rel. Macri v.

Bremerton*, 8 Wash.2d 93, 113, 111 P.2d 612 (1941) ("fraud or malice may furnish a basis for the

recovery of the expenses of litigation, including counsel fees, as an element of damages").

Other states have remedies that are both lesser and greater than Washington's. *See* Hobbs,

Fair Debt Collection Practices Act, NCLC, Appendix E; Unfair and Deceptive Acts and

Practices, Appendix A & C. There is no indication that the settlement considered the state

remedies available other than Ohio, if even Ohio.

## X. Encore-Midland rejected Franklin as a Nationwide Class

Encore has rejected the very argument for nationwide class certification they are now

urging on the court. They should be judicially estopped from doing so out of respect for the court.

Encore-Midland rejected *Franklin* as a nationwide class,

> "Incidentally, to certify Plaintiffs' proposed nationwide class would, of necessity, require this Court to engage in a 50-state analysis regarding the elements of fraudulent and negligent misrepresentation. In a recent opinion, the Supreme Court of Washington declined to certify a national class for this very reason, finding that such a class would not be superior to other forms of action. *Schnall v. AT&T Wireless Servs., Inc.*, ___ P.3d ___, 2010 WL 185943 at *7 (Wash. 2010) (en banc) (Ex. 7). There, the Court held, "there is simply no efficiency in asking a trial judge to manage the laws of 50 different

---

[10] Determined and awarded to Ms. Gray by Judge Leveque.

states as they apply to plaintiffs' contract claims[.]" *Id.* By way of example, the Court posited, "one can appreciate the magnitude of the trial judge's task by imagining a first-year law student who, instead of a course in contracts, is required simultaneously to enroll in fifty courses, each covering the contract law of a single state[.]" *Id.* "Further," the Court stated, "Washington has no interest in seeing contracts executed by AT&T representatives in other states with citizens of those states examined and adjudicated in Washington courts. Certified as a nationwide class action, this case would present an unwarranted and unnecessary burden on the state judicial system[.]" *Id.* Were this case allowed proceeding as a nationwide class action; it would present the very same concerns."

(*Franklin* Doc. # 10, *Reply Brief of Encore Entities*, p. 12, n.4).

Now that the interests of the named Plaintiffs, class counsels and the Defendants have aligned, the Defendant's concerns seem to have evaporated. The law's has not changed but endures. The only claims remaining alleged in *Franklin* and *Vassalle* are the exact claims that Defendant correctly identified as unsuitable for nationwide class treatment.

## XI. Conclusion

Ms. Gray joins in the arguments and objections made by the State of New York joined by 38 attorneys general, (Doc # 27), the affidavit of Steven Gardner (Doc # 26), the objection of Robert Clawson and Landon Herring (Doc # 25), Motion for Intervention by Elaine Pelezer (Doc # 20). For those reasons and those set forth above, Ms. Gray respectfully requests that the Court deny approval of the Encore class settlement.

Respectfully submitted,

By   /s/ Adam S. Nightingale
    Reginald S. Jackson, Jr. (0003558)
    E-Mail: rjackson@cjc-law.com
    Adam S. Nightingale (0079095)
    E-Mail: anightingale@cjc-law.com
    CONNELLY, JACKSON & COLLIER LLP
    405 Madison Avenue, Suite 1600

Toledo, Ohio 43604
Telephone:  (419) 243-2100
Facsimile:   (419) 243-7119

and

Michael D. Kinkley
(*pro hac vice*)
E-Mail: mkinkley@qwestoffice.net
Scott M. Kinkley
(*pro hac vice*)
E-Mail: skinkley@qwestoffice.net
MICHAEL D. KINKLEY, P.S.
4407 N. Division Suite 914
Spokane, WA 99207
Telephone: (509) 484-5611
Facsimile: (509) 484-5972

*Counsel for Objector Kelli Gray*

**PROOF OF SERVICE**

This is to certify that a copy of the foregoing has been electronically filed with the Court on this 3rd day of June, 2011.  Notice of the filing will be sent to the parties by the operation of the court's electronic filing system. The parties may access this filing through the Court's system.

By     /s/ Adam S. Nightingale
*Counsel for Objector Kelli Gray*