**Legal Counsel
for the Elderly**

May 31, 2011

Judge David A. Katz
1716 Spielbusch, Room 307
Toledo, OH 43624-1363

<u>Brent v. Midland Funding, LLC, et al. (Case No. 3:08-cv-01434)</u>

Dear Clerk:

    Please find enclosed an objection to the proposed settlement agreement in the above-referenced matter.

Sincerely,

Dan Koslofsky
Staff Attorney

cc: Murray & Murray

601 E Street, NW | Washington, DC 20049 | 202-434-2120 | 202-434-6464 fax | 202-434-6562 TTY | www.aarp.org/lce
*Legal Counsel for the Elderly is affiliated with AARP.*
Part of the Senior Service Network – Supported by the DC Office on Aging.

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| MIDLAND FUNDING, LLC,<br><br>    Plaintiff/Counterclaim Defendant,<br><br>    vs.<br><br>ANDREA BRENT<br><br>    Defendant/Counterclaim Plaintiff<br><br>    vs.<br><br>MIDLAND CREDIT MANAGEMENT, Inc.,<br><br>    Counterclaim Defendant. | Case No. 3:08-cv-01434<br>Case No. 3:11-cv-0096, N.D. Ohio<br>Case No. 3:10-cv-0091, N.D. Ohio<br><br>HON. DAVID A. KATZ |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLASS
MEMBERS SYLVIA YEADO AND ADA CARTER'S OBJECTION TO THE
PROPOSED SETTLEMENT AGREEMENT**

Class members Ada Carter and Sylvia Yeado, on behalf of herself and the putative class of District of Columbia residents in *Yeado v. Midland Funding. LLC, et al* object to approval of The Class Settlement Agreement ("Agreement").

As one of the nation's largest debt collection agencies Midland Credit Management, Inc. and Midland Funding, LLC (collectively "Midland") frequently attempt to collect purported debt from senior citizens in the District of Columbia. The vast majority of collection lawsuits filed by Midland in DC courts rely on affidavits similar to those described in the present matter. If the Agreement is approved, vulnerable DC seniors – whom Legal Counsel for Elderly is tasked with protecting – will be unable to defend against Midland's unlawful collection actions.

1

## OBJECTING CLASS MEMBERS

### 1. Sylvia Yeado and the Putative Class in *Yeado v. Midland Funding LLC*, et al

On April 16, 2009, Midland sued Sylvia Yeado – then 85 years old – in the Small Claims and Conciliation Branch of the Superior Court of the District of Columbia. Midland alleged that it had purchased a small credit card debt owed by Ms. Yeado. Midland attached to the complaint a computer screen caption and an affidavit from a Midland employee.

However, the debt purportedly owed by Ms. Yeado was beyond the statute of limitations as shown by Midland's own computer screen caption. After Ms. Yeado obtained counsel, Midland dismissed its complaint. Ms. Yeado then filed a complaint against Midland on December 7, 2009.[1] The small claims docket is filled with identically worded complaints and verifications as those filed against Ms. Yeado. Thus, Ms. Yeado sought relief for all District of Columbia residents pursuant to the federal Fair Debt Collection Practices Act ("FDCPA") (15 U.S.C.A. §§ 1692 et seq.), the Consumer Protection Procedures Act ("CPPA") (D.C. Code Ann.§§ 28-3901 et. seq), and the common law of the District of Columbia.

### 2. Ada Carter

Ada Carter is a 79-year-old resident of the District of Columbia. On February 14, 2011 Midland sued Mrs. Carter in the Small Claims and Conciliation Branch of the Superior Court of the District of Columbia. The complaint includes a sworn verification by a Midland employee. Attached to the complaint is a "statement" from Midland purporting to show the balance owed as well as a one paragraph "bill of sale" stating that Midland purchased some debts from "GE Money Bank."

---

[1] Ms. Yeado filed her First Amended Complaint on June 29, 2010. *Yeado v. Midland Funding. LLC, et al*, C.A. No. 09-cv-02311 (EGS)

When Mrs. Carter received the lawsuit she had no idea why she allegedly owed this money. She had never heard of Midland or "GE Money Bank." She called Midland's attorney to ask for more information, but it was never provided. Mrs. Carter appeared pro se at her initial hearing on March 23, 2011. She again asked Midland's attorney for information about the debt. Again, he could not provide it. Instead, he asked the court for a continuance. Mrs. Carter's next court appearance is scheduled for June 8, 2011. To date, Midland's attorney has been unable to provide any credit card statements or other evidence that the statements in its sworn complaint are true.

## LEGAL ARGUMENT

The Class Settlement Agreement ("Agreement") proposed by counsel in this matter is neither fair, reasonable, nor adequate. The Agreement seeks to insulate Midland from any claim under state or federal law "arising out of or relating to the Released Parties' use of affidavits in debt collection lawsuits." Class Settlement Agreement, Doc. 107-1, page 12. In short, the Agreement would prevent thousands of individuals across the country from seeking redress for Midland's fraudulent practices. In exchange, each class member would each receive up to $10.

The Agreement should not be approved. Following the relevant factors set forth by the Sixth Circuit in *Moulton v. United States Steel Corp.,* 581 F.3d 344, 349 (6th Cir.2009) to determine whether this Agreement actually benefits the class, it is clear that this Agreement fails that test for two basic reasons: 1) the Agreement is wholly unfair, unreasonable and inadequate; and 2) the Agreement appears to be the result of a 'reverse auction' engineered by Midland and class counsel.

3

I. **The Proposed Class Settlement Agreement is Unfair, Unreasonable and Inadequate.**

Before this Court can approve the Agreement it must determine that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  This Court acts as a fiduciary of all class members when it evaluates the appropriateness of the Agreement. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002); *In re Cendant Corp. Litigation*, 264 F.3d 201, 231 (3d Cir. 2001); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d Cir. 1987); *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975).

The Sixth Circuit has identified seven "factors" that "guide the inquiry" undertaken by the district court: "(1) the risk of fraud or collusion [i.e. whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining]; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Moulton v. United States Steel Corp.,* 581 F.3d 344, 349 (6th Cir.2009); *UAW v. General Motors,,* 497 F.3d 615, 631(6th Cir. 2007) (citing *Granada Invs., Inc. v. DWG Corp.,* 962 F.2d 1203, 1205 (6th Cir.1992) and *Williams v. Vukovich,* 720 F.2d 909, 922-923 (6th Cir.1983)); *IUE-CW v. General Motors,* 238 F.R.D. 583, 594 (E.D. Mich. 2006) (also including as a factor "whether the settlement is fair to the unnamed class members"); In re *Cardizem CD Antitrust Litigation,* 218 F.R.D.  508, 522 (E.D. Mich. 2003).

The district court is to address "whether the interests for the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *Cardizem,* 218 F.R.D. at 522 (citation omitted).  In considering the seven factors, the district court may choose to "consider only factors that are relevant to the settlement and may weigh particular factors

4

according to the demands of the case." *IUE-CWA,* 238 F.R.D. at 594-595 (citing, *inter alia,*
*Granada,* 962 F.2d at 1205-1206). As set forth below, these seven factors, discussed within the
context of the adequacy of the settlement, the overbroad release, and the overbroad class
definition, compels rejection of the Agreement.

As a starting point, the parties themselves have provided an ample roadmap of the
substantive provisions of the Agreement.  In Section VII of the Agreement, the parties discuss
the affect of any court required changes and note that any change in the a) the monetary
payments; b) the scope of the release to be granted; or c) the definition of the Class will
constitute a substantive change in the Agreement such that the Agreement can be withdrawn.
Taken individually or collectively, these key terms underscore the inadequacy of the settlement
agreement and the unfair result the parties hope to achieve by the approval of the settlement.

Not surprisingly, each and every one of these provisions is not sustainable as a stand
alone provision, nor are these provisions sustainable when considered together. More
importantly, should the court reject, as it should, any one of these provisions, the Agreement
must fail. For contrary to the assertions of the Agreement itself, it is not the job of the court to
pick and choose those portions of the Agreement it finds acceptable. It is the job of the Court to
determine if the Agreement, as written and noticed to the class, is fair, reasonable and adequate.
It is not. As such, it must be rejected.[2]

---

[2] A district court is not a party to the settlement, nor may it modify the terms of a voluntary settlement agreement
between parties. *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 593 (3d Cir. 2010). Rather, "the settlement must stand
or fall as a whole." *Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir. 1977) *citing Patterson v. Stovall,* 528 F.2d 108
(7th Cir. 1976).  In *Evans v. Jeff D.,* 475 U.S. 717, 726-27, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), the Supreme
Court explained the role of a district court in reviewing settlements in class actions:

> Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to
> approve or reject a settlement negotiated by the parties before trial does not authorize the court to require
> the parties to accept a settlement to which they have not agreed.

### A.    The Settlement Amount is Not Adequate

The fairness of a class settlement "turns in large part on the bona fides of the parties'

legal dispute." *UAW*, 497 F.3d at 631. This Court has already held that the use of that Midland's

practice of having employees "sign stacks of form affidavits" without reviewing them violates

the Fair Debt Collection Practices Act ("FDCPA") – which provides for $1,000 in statutory

damages. Memorandum Opinion, Doc. 104, page 5. In short, there is strong likelihood of

success on the merits. Yet, the Agreement provides each class member with compensation of up

to $10. This paltry amount is awarded to all class members – even those who paid thousands to

Midland on debts they may not owe. Even class members who suffered no economic damages

from Midland's fraud are entitled to more than $10.

Worse yet, the Agreement also seeks to wipe out any claims under state law as well.

Class members residing in the District of Columbia alone would suffer immensely. The District

of Columbia Consumer Protection and Procedures Act allows any "person, whether acting for

the interests of itself, its members or the general public," to bring an action in a D.C. court for

unlawful trade practices. D.C. Code §28-3901(k)(1). This is true "whether or not any consumer

is in fact misled, deceived or damaged thereby." D.C. Code §28-3904. The CPPA "affords a

panoply of strong remedies, including treble damages, punitive damages and attorneys' fees, to

consumers who are victimized by unlawful trade practices." *Ford v. ChartOne, Inc.*, 908 A.2d

72, 80-81 (D.C. 2006), *citing District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 717 (D.C.

2003). In short, the CPPA was drafted to ensure that private litigants have the tools necessary to

prevent deceptive trade practices. *Grayson v. AT&T Corp.*, 15 A.3d 219 (D.C. 2011).

Midland's practice of using fraudulent affidavits violates the CPPA. Yet, the Agreement would prevent District of Columbia residents from invoking its protections. For example, Ada Carter, who was recently sued by Midland, would be barred from filing a counterclaim to obtain $1,500 in statutory damages under the CPPA. Even if Midland is able to prove its claim – which amounts to only $1,498.25 – the entire claim could be offset by an award of statutory damages. In sum, Midland may have knowingly used a fraudulent affidavit to file a lawsuit against a 79-year-old DC resident on a debt that she may not owe. Yet, if the Agreement is approved, she will be left with a claim for $10, while Midland is actually free to pursue its claim against her.

Similarly, the putative class members in *Yeado v. Midland Funding LLC, et al,* would be barred from obtaining statutory damages. Even more alarming, many of the putative class members suffered thousands of dollars in actual damages as a direct result of Midland's illegal lawsuits. The sheer number of lawsuits filed by Midland nationally suggest that many class members paid money to Midland to settle the claims or had wages and bank accounts garnished. All of the money paid or taken by Midland as a result of their fraudulent lawsuits should be trebled pursuant to the CPPA and returned to the class members. Instead, these victims of Midland's misconduct will receive $10.

Given the paltry sums involved, particularly in conjunction with the overbroad release and overbroad class definition, the benefits to the class can hardly be construed as better than if the litigation were continued to be pursued.

**B.    The Settlement Agreement Release is Overbroad and Unfair**

The Settlement Agreement's release is an exercise in overreaching, most notably highlighted by the discrepancy in the Release provided by the Class and the Release provided by

7

the putative representative class plaintiffs. Under Section D. 1, the Class releases the

Defendants:

> from all causes of action, suits, claims and demands, whatsoever, known or
> unknown, in law or in equity, based on state or federal law, which the class now
> has, ever had, or hereafter may have against the Released Parties, arising out of or
> relating to the Released Parties' use of affidavits in debt collection lawsuits.

In contrast, Section D. 2 specifies that the named plaintiffs also provide a broad

release of the claims asserted against the Defendants. But, in this Section the release

makes clear that while any debts owed by the named plaintiff's to the Defendants are

released, "[n]othing contained herein shall prevent Defendants from continuing to

attempt to collect the debts owed by the other Class Members." Thus, in exchange for a

woefully inadequate payment of $10, the Defendants obtain a release from every absent

class member who waives any right to assert any defense in a collection action that the

Defendant may continue to pursue against absent class members.

Rather than a settlement agreement and a payment of funds to absolve itself of

wrongful conduct, the $10 payment by Defendants for the broad release obtained is

actually a windfall down payment by Defendant to guarantee a phenomenal return on

investment of its debt collection actions it has yet to collect. There is nothing about this

agreement that is in the public interest. It does not end litigation, but merely perpetuates it

against absent class members who are stripped of any right to defend themselves from

Midland's predatory practices.

The named class plaintiffs, of course, do not share these concerns. For, in

addition to receiving $8,000 in incentive payments (Section C.1 (a)), the named plaintiffs

also receive a relief from any debt owed to the Defendants. By agreeing to such terms

that confer benefits on themselves[3] that are not shared by absent class members, both the class plaintiffs and their counsel have demonstrated their inadequacy to represent the interests of the class.[4]

As specified in *NACA Guidelines*, individual releases of named class representatives are not recommended in class litigation for the very reasons underscored by the releases asserted here: there is an obvious temptation to provide more for class representatives than the class as a whole. *NACA Guidelines*, 176 F.R.D. at 388. That temptation was given into in this instance. As such, the judgment of counsel in assessing the adequacy of the relief presented cannot be entitled to any substantial weight in considering the merits of the settlement agreement. Both class counsel and the class representatives have agreed to terms that place themselves in an inevitable conflict of interest with absent class members.

Equally disturbing is the release's attempt to incorporate known and unknown causes of action that absent class members may have against the Defendants. Thus, the release purports to include future damaged persons in the class, defeating the predominance requirement of Fed. Rule 23(b)(3). It also makes it impossible for the named class members (who will not suffer future damage and will even have their debts eliminated) to represent the interests of these future damaged, absent class members as

---

[3] The objectors' concerns are focused not on the incentive payments class representatives may receive, but on the additional relief class representatives (i.e. the dismissal of debt collection actions against them) seem to have obtained only for themselves that are in addition to the incentive payments.

[4] Inadequacy is also demonstrated by resort to a claims procedure to obtain payments. Since this entire case is predicated on the submission of false affidavits in connection with claims filed against absent class members, there would seem to be little doubt that the Defendants have information available to pay money directly to absent class members. The insertion of claims process is seemingly unnecessary and appears to have been imposed solely to assure that the Defendants will never have to pay anything in excess of $5.2 million. Where direct distribution of damages is possible, as would appear to be the case here, it is generally incumbent upon class counsel to insist on such direct distribution. *See National Association of Consumer Advocates, Standards and Guidelines for Litigating ad Settling Consumer Class Actions (NACA Guidelines)*, 176 F.R.D. 375, 394 (1997).

9

required by Rule 23(b)(4). As the Supreme Court made clear in *Amchem Products, Inc. v. Windsor*, 117 S.Ct. 2231 (1997), this type of release is fatal to class action approval for the simple reason that notice cannot be given to persons who are not aware of their damages. The unfairness of this agreement to absent class members cannot be overstated.

## C.     The Class Definition is Overbroad

Having consummated a paltry settlement with an overbroad release, the settling parties were not content with limiting their abuse of the class action device to Ohio consumers. Instead, seeing an opportunity to buy an incredibly favorable release for itself in every jurisdiction in the United States, the Midland Defendants suddenly agreed to expand the class definition from a class limited to Ohio, to one covering the entire United States. As explained above, the monetary relief for Ohio residents alone is inadequate. To even suggest the monetary relief is adequate for the every affected resident of the United States is an absurdity.

As specified in *NACA Guidelines*, 176 F.R.D. at 386, when confronted with the opportunity to expand the size of the class as part of a settlement, "counsel should be reluctant to agree to expand the class definition at the settlement stage, 2) should refrain from agreeing to unnecessarily broad releases which wipe out claims asserted in other pending cases, and 3) should be cautious about settling anything beyond what is alleged in the complaint and mindful of preserving the opt-out rights of class members." Class counsel has failed in all three fundamental cautions.

Moreover, as explained below, the process of converting this case at settlement from an Ohio class to a nationwide class casts suspicion over the integrity of the entire Settlement Agreement as an objectionable reverse auction settlement.

## II. The Proposed Settlement is the Result of a 'Reverse Auction' Orchestrated by Midland and Class Counsel.

In general, settlement agreements should be closely scrutinized for evidence of collusion between the defendants and plaintiffs' counsel that results in reverse auction. *Moulton v. United States Steel Corp.,* 581 F.3d 344, 349 (6th Cir.2009); *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.* 418 F.3d 277, 308 (3d Cir. Pa. 2005); *Joel A. v. Giuliani,* 218 F.3d 132, 138 (2d Cir. 2000). Reverse auction occurs when a subset of the class counsel agrees to a weak settlement that includes high plaintiffs' fees and precludes other claims against the defendant. *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991).

Here, the terms of the Agreement reek of reverse auction. While there is no direct evidence of collusion, the circumstantial evidence is compelling. Prior to the execution of the Agreement, Midland faced liability only as to a class of consumers in Ohio under the *Brent* action. See Memorandum Opinion, Doc. 104. Midland objected to, and this Court denied, Plaintiffs' request to certify a national class. Memorandum Opinion and Order, Doc. 72. Most notably, Midland's objection to a national class specifically cited the problem of certifying a national class that is "subject to the laws of all fifty states." Doc. 65, page 18. In addition, Midland successfully dismissed the single count *Franklin* action that sought nationwide certification. The only remaining assertion of a nationwide action was the *Vasalle* action filed only two months prior to the execution of this Settlement Agreement.

Midland's about face is not surprising given the remarkable scope of the Agreement. It insulates Midland "from all causes of action, suits, claims and demands, whatsoever, known or

unknown, in law or in equity, based on state or federal law…arising out of or relating to [their] use of affidavits in debt collection lawsuits." Midland's collection lawsuits would be untouchable. Consumer defendants with purported debt obligations would be barred from raising counterclaims and affirmative defenses as long as Midland used an affidavit or verified complaint, which it routinely does or is required to do under the laws of the various states. As previously noted, this is precisely the practice Midland follows in the District of Columbia.

This Court noted that Midland filed over 40,000 lawsuits in Ohio from June 2007 to October 2009. Memorandum Opinion, Doc. 104, page 6. Midland's national scope means hundreds of thousands of consumers could be prevented from defending these lawsuits. Of course, Midland is not required to return any of the money it collected as a result of filing fraudulent affidavits. Nor is it required to stop pursuing debt collection lawsuits based on them. In return, Midland will pay these consumers up $10.

The total amount Midland is required to pay, $5.2 million, does not come close to covering just the Ohio claims. This Court has already certified an Ohio class and ruled that use of these false affidavits violates the FDCPA. Memorandum Opinion, Doc. 104. To provide $1,000 in damages under the FDCPA to just the 40,000 Ohio defendants this Court has already identified would result in $40 million in damages.

In a recent filing with the Securities and Exchange Commission Midland almost confesses to arranging a reverse auction. Midland states that they "are routinely subject to legal actions based on the Fair Debt Collection Practices Act, or FDCPA, comparable state statutes and common law causes of action" including claims that they "have made inaccurate assertions of fact in support of our collection actions." Annual Report Form 10-K, page 17, February 14, 2011. Midland goes on to admit that a "number of these cases are styled as class actions and a

class has been certified in several of these cases." *Id*. After describing the Brent matter in detail,

Midland confesses:

> We are defending a number of additional class action cases which assert, among other things, affidavit claims similar to those asserted in the *Brent* litigation. Because of the similarities of the claims, the proposed settlement of the *Brent* case is expected to resolve the affidavit claims in these other cases.
>
> *Id*.

Midland's own statements align perfectly with one court's description of a reverse auction. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282-283 (7th Cir. 2002) (describing reverse auction as "the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement within the hope that the district court will approve a weak settlement that will preclude other claims against the defendant").

The inherent unreasonableness of the Agreement itself, combined with Midland's own actions and statements, the hasty resolution of a suit filed only weeks before the consummation of the Agreement that vastly expanded the scope of the class, and the broad release obtained demonstrate that the Agreement is the result of a reverse auction engineered by Midland and it should not be approved.

## CONCLUSION

For the reasons stated herein, the Agreement is not fair, reasonable or adequate to class members. Were this Court to properly apply the seven factors identified by the Sixth Circuit to "guide the inquiry" in determining the fairness of the settlement, the only conclusion that can be reached is that the motion of the parties to order final approval of the settlement should be denied. The sums paid by the Defendants are inadequate, the release is overbroad and the class definition is overreaching. Rather than a fair settlement, the settlement appears to meet all of the

13

attributes of a reverse auction that actually utilizes the imprimatur of this Court to hamstring absent class members from defending themselves against Midland's abusive collection practices. Accordingly, the settlement should not be approved and the objections of the objectors should be sustained.

## RESERVATION OF RIGHT TO EXCLUDE

Class members Ada Carter and Sylvia Yeado, on behalf of herself and the putative class in *Yeado v. Midland Funding. LLC,* hereby reserve their rights of exclusion should this Court approve the Agreement.

May 31, 2011                                          Respectfully submitted,

Dan Koslofsky, DC Bar No. 994899
Legal Counsel for the Elderly
601 E Street, N.W.
Washington, DC 20049
202-434-2162
*Attorney for Ada Carter*

Philip Friedman  DC Bar No. 421854
Friedman Law Offices
2401 Pennsylvania Ave., N.W. Suite 410
Washington, DC 20037
202-293-4175

Amy Mix, DC Bar No. 483483
Legal Counsel for the Elderly
601 E Street, N.W.
Washington, DC 20049
202-434-2171
*Attorneys for Plaintiff Sylvia Yeado*

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of May2011, a true and correct copy of the foregoing MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLASS MEMBERS SYLVIA YEADO AND ADA CARTER'S OBJECTION TO THE PROPOSED SETTLEMENT AGREEMENT was mailed to:

Murray & Murray
Attn: Rhonda Rice
111 East Shoreline Drive
Sandusky, OH 44870-2517

Dan Koslofsky (Bar No. 994899)