\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| MARTHA VASSALLE, et al., | : | Case No. 3:11CV0096 |
| Plaintiffs, | : | And Related Case |
| | | Case No. 3:10CV0091 |
| vs. | : | **JOINT MEMORANDUM IN** |
| | | **OPPOSITION TO JOINT MOTION** |
| MIDLAND FUNDING, LLC, et al., | : | **FOR APPROVAL OF CLASS ACTION** |
| Defendants | : | **SETTLEMENT** |

HON. DAVID A. KATZ

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## I.  THIS COURT HAS A FIDUCIARY DUTY TO ACT IN THE BEST INTERESTS OF THE CLASS

Under Rule 23(e), a district court acts as a fiduciary, guarding the claims and rights of the absent class members. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) (recognizing that a lawyer's self interest may trump the interests of the class members and finding that district judges are "subject therefore to the high duty of care that the law requires of fiduciaries"); *In re AT&T Corp. Secs. Litig.*, 455 F.3d 160, 175 (3d Cir. 2006); *Romstadt v. Apple Computer, Inc*, 948 F. Supp. 701, 705 (N.D. Ohio 1996). Numerous courts have emphasized this important duty to safeguard the rights of the class. *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 782, 805 (3d Cir. 1995) ("Rule 23(e) imposes on

1

the trial judge the duty of protecting absentees, which is executed by the court's assuring that the settlement represents adequate compensation for the release of the class claims."); *In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166, 192 (D. Mass. 2005); *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 94 (D. Mass. 2005); *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (U.S. 1997) (noting that Rule 23(e) protects unnamed class members from "unjust or unfair settlements" agreed to by "fainthearted" or "self-interested class representatives").

## II.  THE PROPOSED SETTLEMENT IS INADEQUATE, UNFAIR, AND UNREASONABLE

In considering whether to grant final approval to a proposed settlement, the touchstone is whether the settlement is "fair, reasonable, and adequate." *International Union, United Auto., Aerospace, and Agr. Implement Workers of America v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).  As a starting point, the Court "cannot 'judge the fairness of a proposed compromise' without 'weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement.'"  *Id*. at 631 (citations omitted).  In Section A, below, objectors will demonstrate that the scales tip heavily against the compromise the parties have reached here. Success on the merits was all but assured, as shown by this Court's grant of summary judgment against Midland, finding that Defendants had engaged in a routine practice of manufacturing affidavits falsely attesting to personal knowledge they did not have. On the other side of the scales, the entire class will actually be harmed by the settlement as they will lose important rights, yet 90% of them will receive nothing in return, while the monetary relief provided to the other 10% of the class is a mere pittance.

Section B below will discuss, as relevant, several other factors courts also consider in evaluating the fairness of a proposed settlement, showing that these too counsel against approving the proposed settlement.

**A. The Settlement is Unfair to the Class As Success is Highly Likely and the "Relief" Will Harm More than Help Class Members**

The merits of this case are very straightforward:  Midland uniformly falsified affidavits it filed in state court collection actions.  This Court has already found that Midland's practices violate the Fair Debt Collections Practices Act and granted summary judgment on that basis. Brent Dkt. 50, reported at 644 F. Supp.2d 961 (2009).  There is not just a likelihood of prevailing on the merits- - plaintiffs have already prevailed in Ohio.  False affidavits were used throughout the country, which is why Midland wants this case certified as a national class action (*see also* Reimann v. Brachfeld, Dkt. 144-1) so there is every reason to believe that plaintiffs in other statewide class and individual actions could likewise prevail.

Focusing on the California putative class action represented by several of the undersigned and where, according to Midland, 61,312 class members reside (Dkt. 122-1, p.4), Defendants' assertion that this action has little hope of success is based on its misunderstanding or misrepresentation about the claims in the suit and the controlling law.   Midland asserts that the state law claims are limited to equitable relief, when in fact the *Reimann* plaintiffs' claims under the Rosenthal Fair Debt Collection Practices Act, Cal. Civil Code Section 1788 et. seq., are for statutory and actual damages.  Midland then argues that the California state law claims are "weak," predicting that a California Court would shield its fraudulent affidavits under the "litigation privilege".  Vassalle Dkt 133, p. 10.   A long line of California state and federal courts shows Midland is wrong.[1]  The California case is pending in state court, and defendants' attempt to remove the case to federal court has been rejected by Judge Seeborg of the Northern District of California. Reimann v. Brachfeld, et al., 2010 LEXIS 131727 (N.D.Cal. 2010). Equitable

---

[1] These cases have all held that plaintiffs' claim under the Rosenthal Act is not barred by the litigation privilege:  *Komarova v. National Credit Acceptance, Inc.*, 175 Cal.App.4th 324 (2009); *Welker v. Law Office of Daniel Horwitz*, 699 F.Supp.2d 1164, 1173 (C.D. Cal. 2010); *Yates v. Allied Intern. Credit Corp*., 578 F.Supp.2d 1251, 1255-1256 (S.D.Cal. 2008); *Butler v. Resurgence Financial, L.L.C*., 521 F.Supp.2d 1093, 1095-1097 (C.D.Cal. 2007); *Mello v. Great Seneca Financial Corp*., 526 F.Supp.2d 1024, 1030-1031 (C.D.Cal. 2007); *Oei v. N. Star Capital Acquisitions*, L.L.C., 486 F.Supp.2d 1089, 1098-1101 (C.D.Cal. 2006).

relief under the California Unfair Competition Law[2] is available that may permit California class members to obtain relief from judgments entered against them, in contrast to the bar against this Court granting such relief due to the *Rooker-Feldman* doctrine, as noted by Class Counsel in Dkt. 127, n. 3 at p. 7.  As to the California class, this is an additional reason why the proposed settlement is unfair and inadequate.

As to the Virginia putative class represented by others of the undersigned, if judgments obtained by Midland were vacated on the basis of the false affidavits used to obtain them, then Midland would be unable to obtain judgments because it generally has only an electronic file with basic information about the alleged debt and lacks documents about the underlying account and debt. Brent Motion for Summary Judgment Dkt. 34 at 4-5; Poindexter dec., being filed herewith.

Even were success here not largely assured, a settlement can not possibly pass muster when it harms the class more than it helps.  Here, the 10% of the class which has filed claims would benefit to the extent of a payment of $10, or if the parties are permitted to ignore the terms of the settlement agreement and revise it by agreement ex post facto, then perhaps a few more dollars will be paid to this 10% of the class.  This small difference does not alter meaningfully the imbalance of value to harm of the settlement.[3]

To understand the major source of harm to the class from this settlement, the Court must review the extent to which class members' claims are in fact released by the settlement.  A key aspect of the release is not in dispute.  The Settling Parties concede that the release will prevent

---

[2] Under section 17200, a court may fashion injunctive relief for the violation of other laws prohibiting unfair business practices.  See, e.g., *Irwin v. Mascott, 112 F. Supp. 2d 937*, 964 (N.D. Cal. 2000).  Because Plaintiff's Bus. & Prof. Code § 17200 claim is derivative from a claim that is not subject to litigation privilege, it too survives.  *Id.* at 963 (granting relief under § 17200 for FDCPA violations, and rejecting the defendant's argument for the application of a common interest privilege under Cal. Civ. Code § 47(c), noting that "attorneys have been found not to be exempt from liability for FDCPA violations under a litigation exemption.").

[3] It might, however, have affected whether a class member bothered to file a claim, but it is too late now for those who did not do so since they had been told, apparently incorrectly, that the maximum payment they could receive was $10.

all class members from asserting affirmative FDCPA and CPA claims against Midland and against attorneys representing Midland based upon the false affidavits.  This in turn will deprive class members of the best leverage they possess for getting illegally-obtained judgments lifted: affirmative litigation.  Once they have done so, they can then defend against alleged debts on the merits, and Midland will quite properly have the burden of proving the debt through admissible evidence.  If, on the other hand, the proposed settlement is blessed by this Court, then Midland will be rewarded for its defalcation by having the burden of proof shifted to the alleged debtor against whom a judgment has been taken.

Second, as filed with and preliminarily approved by this Court, the release extends to "all causes of action, suits, claims and demands, whatsoever, known or unknown, in law or in equity, based on state or federal law, which the class now has, ever had or hereafter may have against the Released Parties, arising out of or relating to the Released Parties' use of affidavits in debt collection lawsuits." (Settlement Agreement, Dkt. 107-1 at p. 12).  There is nothing ambiguous in this statement, and both Settling Parties have until very recently taken it to mean what it says.  For example,

- The settlement website which Class Counsel states he "directed and supervised," Dkt. 134-1 at 9, states that: "By staying in the class, all of the Court's orders will apply to you, and you give Defendants and their affiliates a 'release.' A release means you can't sue or be part of any other lawsuit against Defendants about the claims or issues in this lawsuit, or any other claims arising out of affidavits attached or executed in support of collection complaints filed against Class Members by Defendants or any of their subsidiaries or affiliates."
- Similarly, Defendants stated in briefing to this Court that only "[c]lass members who validly opt out will have the right to challenge the judgments against them."  Brent Dkt. 150, filed April 25, 2011, at 4.

Now, however, they have filed contradictory statements about the scope of the release:

- On the one hand, in a joint filing, they misleadingly state that class members will be barred from vacating judgments "except where the *sole* reason for vacating the judgment is that an affidavit made without personal knowledge was used in the case."  Joint Motion for Approval, Dkt. 131 at page 12 (emphasis in original).

- In a brief filed on the very same day, plaintiffs' counsel pushes the misrepresentation even further, stating that "Nothing in the release will prevent a Class Member from seeking to vacate a judgment, to the extent and on the grounds that that relief is available under the governing law of the jurisdiction." Dkt. 127 at page 7.

- However, contradicting both of these statements, Defendants in each of two briefs also filed the same day admit that "class members who do not opt out may not sue Midland for filing false affidavits in debt collection lawsuits, and they may not seek vacatur of their judgments on that basis." Dkt. 124 at p. 5; Dkt. 133 at p. 5 is to the same effect.[4]

Here again, Defendants have accurately stated the scope of the release -- the release does not just apply to false affidavits of personal knowledge.  While Midland has argued elsewhere that case law would restrict the scope of the release because a release can only cover claims based on the same factual predicate as the settled suit, Dkt. 135, p.7, this is cold comfort.  First, most class members will not be knowledgeable and savvy enough to be aware of this rule of law.  Second, courts in which it is raised in the future will be forced to review the pleadings in the *Brent*, *Vassalle* and *Franklin* actions to attempt to discern the factual predicates for all three of these cases, leading to substantial unnecessary and wasteful litigation that a properly crafted release could have avoided.

It is the broad scope of the release that leads to the second serious harm to class members from what is supposed to be a settlement that benefits them: the extensive inability to vacate improperly obtained judgments.  Vacating such judgments is generally highly effective in obtaining complete relief for the alleged debtor. As class counsel established in a deposition of a Midland employee, Midland typically receives only a magnetic tape with information about the alleged debt, not any actual account documents, that Midland does not seek such documents except sometimes in the event of a dispute, and that Midland may or may not be able to obtain

---

[4] This disparity indicates that in fact there has been no meeting of the minds on the proposed Settlement which is in itself a reason it should be rejected. *DirectBuy*, *supra*, 2011 U.S. Dist. LEXIS 51874 at *50 ("Ambiguity within the release of a class action settlement agreement all but requires future litigation. The court does not need to decide whether this disagreement over scope could affect the court's ability to review the Agreement. However, the court finds the fact that the parties cannot agree on the meaning of such an important aspect of the Agreement incomprehensible, and the court does not intend to approve any future settlement agreements between the parties absent a more clearly written release.").

them even then.  (Brent Motion for Summary Judgment, Dkt. 34 at 4-5).  In Virginia, for example, once a judgment was vacated, Midland would be unable to obtain a valid judgment without such documents. Poindexter Dec., being filed herewith. Yet the parties seem to want this Court to believe that Midland generally has the means to obtain judgments without false affidavits. Objectors believe that it is because this Court has been mislead into accepting this incorrect assumption that it has improperly discounted the value of damages available to class members who had judgments taken against them for incorrect amounts or which they did not owe at all, for example due to identity theft.

 As Defendants admit -- indeed, this is at the heart of their desire for the Get Out of Jail Free card class counsel is offering them -- it is not only affidavits falsely attesting to personal knowledge which the affiant does not in fact have that will be immunized by this release.  So too will affidavits containing substantive falsehoods about the amount of a debt, the last date of payment or the identity of the debtor.  False affidavits are not only an affront to the court system, they are by far the most readily provable basis for a debtor to convince a court to vacate an improperly obtained judgment, thus forcing the party seeking judgment to provide proper proof of its claim.

By insulating the personal knowledge allegations of the fraudulent affidavits, Midland is making an effort to bootstrap an armor coating to the substantive allegations in its state court collection actions.  It is Midland's demonstrated legal position that once a default judgment exists, the judgment converts the substantive testimony of the underlying affidavits into indisputable fact.  Indeed, in the Reimann case currently pending against Midland in California state court (one of the cases that Midland is trying to head-off by virtue of the current settlement application), Midland filed a motion arguing that a consumer should be precluded from his unfair debt collection allegations because the facts were "conclusively established against [the consumer] by the El Dorado County Superior Court [by virtue of the default judgment based upon a form Midland affidavit]." *See* Appendix A at 10:23-24. Reynolds Declaration, being

7

filed herewith, Exh. C at 10:23-24. Midland then goes on to state that the default judgment against the consumer "conclusively establishes that Midland Funding NCC-2 Corp. is entitled to recover the judgment amount against him." Id. at 10:26-27.  In other words, Midland takes the position that default judgments definitively establish the **substantive** testimony of the affiants, notwithstanding that the affiants undisputedly had no knowledge of those facts and obtained the judgment by perjury and fraud.  Given this insight into Midland's interpretation of the impact of these fraudulently obtained judgments, it would be irresponsible for the Court to approve a release would render such judgments virtually immune to attack.

Moreover, while it is true, as the settling parties argue, that claims against independent process servers who falsely swear to having completed service of process may remain viable, this is cold comfort when it is Midland who uses such affidavits to obtain default judgments and those judgments will be unassailable on this basis.

A settlement insulating judgments and protecting it from FDCPA and CPA claims would be worth at least 3 billion dollars to Midland. As noted by Amicus Curiae CAMBA Legal Services et al., such judgments average $2600, and the class is approximately 1.4 million individuals.  In contrast, the class as a whole will be worse off.  Comparing what 1.44 million class members will lose -- namely, FDCPA claims worth millions of dollars and the inability to obtain relief from unjust judgments for billions more-- with the payment that approximately 10% of the class will receive -- perhaps a bit more than $10.00 apiece[5] -- shows the trade-off is clearly against the best interests of the class as a whole.  As one unrepresented class member has told the Court, "I hope you realize that a settlement offer equivalent to a lunch at McDonalds is not only unfair but unjust in the extreme."  Dkt. 90.  Nor can this imbalance be righted by taking into

---

[5] The Settling Parties do not estimate in their Joint Motion for Approval how much more than $10 the payments are likely to be, assuming they can ignore the Settlement Agreement that caps such payments at $10.  However, the total available for the approximately 1.33 million claimants will certainly be under $2.5 million because over $1 million has already been paid to the Administrator (Dkt. 131, n. 5 at p. 9), with more to come, and class counsel is seeking attorney fees of $1.5 million plus costs.

consideration the injunctive relief to which Midland has agreed, as demonstrated by both the FTC (Dkt. 55, p.7) and thirty eight Attorney Generals (Dkt. 27, pp. 9-10) in their briefing.

### B.  Relevant Factors Also Do Not Favor Approval of the Settlement

In addition to evaluating the benefit (and in this case, the harm) to the class from the proposed settlement as discussed above, courts may consider seven other factors in determining whether to approve a proposed settlement: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).  "No one of these factors is dispositive. Rather, all are to be weighed and considered in light of the particular demands of the case. *See, e.g.*, *Granada Investments, Inc. v. DWG Corp.*, 962 F.2d 1203, 1205-06 (6th Cir. 1992)." *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 U.S. Dist. LEXIS 87409 (D. Ky. 2010).

Like the analysis of the relative benefit of the settlement to class members, these factors counsel against approval.

### 1. There is at least a Risk of Fraud or Collusion

While objectors have no direct evidence of fraud and collusion between the settling parties, heightened scrutiny of a proposed settlement is always warranted when, as here, parties who have been litigating a statewide-only class action and have never even filed a motion to certify a nationwide class suddenly agree to settle on that basis only because several parallel statewide class actions have been filed elsewhere.  The temptations are obviously great: on the one side, a vastly enhanced pot of money from which class counsel can seek a percentage fee, and on the other, global peace for defendants.  Importantly, none of the other parallel actions seek nationwide class status, so they present no threat to Ohio class counsel's efforts with respect to an Ohio class.

### 2. The Complexity, Expense and Likely Duration of the Litigation cannot be Predicted

This factor is impossible to evaluate in this case because as is explained in Section IV of this Brief below, a nationwide class should not be certified.  Thus this Court would have to try to predict the likely course and outcome of the litigation in at least four other states where parallel class actions are currently pending, plus others in those where they are likely, such as New York, Michigan and Maryland.

### 3. The Parties' Discovery was Limited

From the record, it appears that two Midland witnesses were deposed. The Declaration of Dennis Murray does not reveal how much time was devoted to this most demanding type of discovery.  With respect to discovery conducted by Midland, only one proposed class representative, Andrea Brent (and her husband) was deposed.  Not surprisingly, Vassalle, Johnson and Franklin were not deposed since *Vassalle* was filed less than two months before the settlement and *Franklin* was dismissed.

### 4.  The Likelihood of Success on the Merits is Very High

As noted in Section II A above, Summary Judgment has already been granted on liability and thus there is a strong likelihood of success on the merits that counsels against the proposed settlement.

### 5.  The Opinions Of the Class Representatives Do Not Support the Proposed Settlement

While plaintiff's counsel counsel naturally supports the proposed settlement, this factor also looks to whether *the class representatives* proclaim their support of the proposal.  The proposed class representatives in this case have been completely silent.  Not a single class representative has submitted a declaration avowing his or her approval of the proposal.  This stands in stark contrast to the many passionate objections the Court has received from class members urging the Court to reject it.

**6. The Reaction Of Absent Class Members Requires Rejection of The Proposed Agreement**

The settling parties claim that there are only 57 objections.  Dkt. 131, p. 25.  They then claim that this is a small percentage of the class as a whole and conclude that this fact supports approval of the proposed settlement.  This argument is wide of the mark.

To begin with, it is well established that in most settlements, few objections if any are received.  *In re Traffic Executive Asso.--Eastern Railroads*, 627 F.2d 631, 634 (2d Cir. 1980) ("A substantial lack of response from absentee class members appears to be the norm rather than the exception.").  There are many reasons for this: it requires substantial effort to object in writing, many class members lack the sophistication to understand what they have to lose if the settlement is approved or to formulate an appropriate objection, and often, as here, class members have a very small stake at issue -- or at least they think they do, since the notice they received misleadingly said nothing about losing their right to seek to vacate judgments obtained using false affidavits on that basis and instead led them to believe that the only important question was whether they wanted to receive a payment of $10.  Problems with the notice, such as those apparent in this case,[6] contribute to a low response rate.  *See, e.g.*, *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995); *Wilson v. DirectBuy, Inc.*, 2011 U.S. Dist. LEXIS 51874, 31-32 (D. Conn. 2011).

Here, in any event, the objections have been vociferous.  *See In re GMC, supra,* 55 F.3d at 813.  Some class members sought out legal service lawyers to submit an objection on their behalf.  Vassalle Dkt. 75, 68.  Organizations such as the Legal Counsel for Elderly (Vassalle Dkt. 57), CAMBA Legal Services, a Municipal Employees Union and others (Vassalle Dkt. 137), and MFY Legal Services (Vassalle Dkt. 68) took the time to strenuously and unequivocally urge this Court to reject the proposed settlement.

---

[6] These problems are discussed in Section III, *infra*.

In addition, no fewer than 38 states have joined together through their state attorneys general to point out the many deficiencies in the proposed settlement.  The attorneys general[7] represent "hundreds of thousands, if not millions, of eligible class members." *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1328 (S.D. Fla. 2007) (the views of the attorneys general "counsels against a finding favorable to the parties…"); *see also*, *Wilson v. DirectBuy, Inc.*, *supra*, 2011 U.S. Dist. LEXIS at *33 ("The court finds [the attorneys general] Memorandum to be especially helpful and *views it as a placeholder for many absent class members' objections*" (emphasis added)).

Nor is that all.  This Court has received the amicus brief of the Federal Trade Commission also urging the Court not to approve the proposed settlement.  The Commission is the "chief federal enforcer of the FDCPA" and is uniquely situated to comment on the proposed settlement.  It summed up its comments as follows:

> This bargain leaves class members in a significantly worse position than the *status quo*.  By contrast Defendants, in essence, have insulated from attack over a million judgments entered nationwide, many of them defaults, thus protecting future collections on these judgments.  In addition, Defendants have agreed to a limited injunction that addresses only affidavit procedures in future proceedings, but does not require Defendants to take any action to remedy consumer harm resulting from judgments already obtained using false affidavits.  Vassalle Dkt. 55, p.1.

In short, the objections to the proposed settlement have been cogent, they encompass a broad selection of the class, and are voiced by respected organizations as well as those sworn to uphold the laws of the several states and the statutory scheme at issue in this litigation.  The settling parties' purported justifications are drowned out by these unified voices.  The persuasive,

---

[7] Recognizing the serious problem the opposition of the Attorneys General creates for approval of the settlement, Midland attempts to diminish their force by claiming that Virginia counsel conferred with some of them.  In reality, it was the settling parties themselves that "solicited" the AGs' opinions as required under the Class Action Fairness Act.  Vassalle Dkt 21, p. 2.  This Act requires notice to the AGs specifically to permit them to respond to inequitable settlements.  Dkt. 27, p. 2. Finally, when citing *Hall v. Midland Group and Midfirst Bank*, 2000 WL 1725238 (E.D. Pa. 2000), for the proposition that Courts have rejected the opinions of Attorneys General when they have been "solicited" by an objector, Midland fails to note that the court in *Hall* did not reject these opinions *because* they were solicited.

extensive oppositions that have been asserted here compel the rejection of the proposed settlement.

### 7. The Public Interest Weighs Heavily Against the Proposed Settlement

This final factor is heavily against the proposed settlement.  Midland has committed a massive fraud on courts across the nation.  It has abused the judicial system by obtaining judgments based upon falsified factual assertions.  This settlement would safeguard those judgments for all time from attack on that basis.  If the settlement were to be approved, Midland could continue to accrue post judgment interest on judgments it should never have obtained in the first place and probably can not obtain again as it lacks documentary evidence to support the suits it files, relying instead on the high probability of a default judgment.[8]  It could garnish wages, levy bank accounts and conduct sales of property.  It could continue to report these judgments on credit reports preventing class members from obtaining loans, getting jobs or renting apartments.

In her most recent complaint, Andrea Brent claims that, as a result of  Midland's actions, she "has suffered actual damages in the form of anger, anxiety, emotional distress, fear, frustration, upset, humiliation, embarrassment, amongst other negative emotions, as well as the cost of defending the unwarranted and illegal collection lawsuit brought against her."  Many objectors have echoed these sentiments.  *See, e.g.*, Dkt. 102 ("[this experience] has caused me trauma such as I have never known.").  For Andrea Brent, this settlement will relieve that anxiety by dismissing the underlying collections action.  Her anger also may be assuaged by her share of the $8,000 in incentive awards she will be provided.

The rest of the class is not as fortunate.  They will receive approximately $10.00, or nothing at all if they did not receive notice because skip tracing was not used or if they were dissuaded from responding due to the many defects in the notice, including its naturally

---

[8] See Brent Motion for Summary Judgment, Dkt. 34 and "Practical Realities of Debt Collections Actions by Debt Buyers," Memorandum of Amici Curiae CAMBA Legal Services, et al., Dkt. 137-1 at pr. 8-10.

engendering a fear of giving out their addresses, phone numbers and bank account information. Yet they will be left to fend off judgments that Midland obtained by fraud and will be materially worse off because of the settlement.  Under the settlement, they will lose several important legal rights:  the ability to vacate a judgment based upon Midland's fraudulent conduct, the ability to bring such claims under state consumer protection statutes, and the ability to bring an FDCPA claim based upon Midland's misconduct.[9]

The public interest does not support the proposed settlement.  According to published reports, in 2010, Encore Capital Group collected $266.7 million through lawsuits. It has stipulated in this litigation to a net worth in excess of $50 million. Thus the proposed settlement imposes a comparatively small penalty.  However it, does nothing to address the severe consequences of defendant's fraudulent conduct, and actively causes harm to class members by taking away important rights for so little in return, as the Attorneys General have well argued in their Amicus brief. Vassalle Dkt. 27, p. 11.

### III. THE NOTICE WAS INADEQUATE AND VIOLATES DUE PROCESS

As Objectors previously explained in detail, the notice in this case was seriously flawed and violated due process.  Vassalle Dkt. 25, pp. 16-22.  For example, it did not mention that the release  covers attorneys who had sued class members, failed to disclose special benefits (forgiveness of debt) to the class representatives, incorrectly claimed that the settlement provided that the Court's litigation injunction may be extended, did not explain the basis for the fees sought by class counsel and perhaps most importantly, failed to inform class members that the settlement would preclude them from vacating judgments based upon the fraudulent affidavits.

---

[9] All of these claims are extremely valuable to members of the class.  As the Attorneys General noted: "a substantial portion of class members would likely be successful in vacating the judgments against them, leading to a significant monetary benefit for those class members. Because this Court has already held that Defendants repeatedly and routinely violated the Federal Fair Debt Collection Practices Act and Ohio consumer protection laws by using false and misleading affidavits to support complaints in debt collection lawsuits these claims have a high probability of success." Vassalle Dkt. 27, p. 8

Moreover, there were no protections in place to prevent Midland from using class members' addresses (from the claim forms) or bank account information (from cancelled checks) to further its collection activities.  This undoubtedly is one explanation for the very low claims rate in this settlement.

The parties have offered no excuse or explanation for failing to submit a notice plan for Court approval as the settlement agreement requires. Dkt. 107-1 at p. 14. They do not address the failure to disclose all benefits to the named representatives.  They attempt to explain away their failure to inform class members of the settlement's impact on vacating judgments by citing a completely inapposite case.  Dkt. 133, p. 14, *citing Mangone v. First USA Bank*, 206 F.R.D. 222, 234 (S.D. Ill. 2001) (notice need not list "every conceivable claim or cause of action that could have been asserted in the litigation").  Plainly, the impact on vacating judgments is information "a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment."  *In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1104-05 (5th Cir. 1977). Nor is their failure to explain this impact surprising since even today they do not seem able to agree on what that impact would be.

Indeed, the parties have just this week disclosed that a summary notice was also published twice in USA Today.  Vassalle Dkt. 131, p. 12.  While additional notice is normally favored, the parties usurped the Court's role in determining what periodicals to publish it in and the frequency of publication.  The parties took it upon themselves to determine the content of the summary notice, as a result of which it contains less information than the notice the Court approved, with no mention whatsoever that claims and rights will be released.  Reynolds Declaration, Exhs. A and B attached hereto.  *See*, *e.g*., *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig*., 2009 U.S. Dist. LEXIS 119870 *48 (W.D. Ky. 2009) (finding the notices to be incomplete and directing the parties to "submit to the Court final copies of the detailed notice, publication summary notice, summary notice, and summary postcard notice for final approval prior to mailing or publication.")

It is unfortunate that the Court's oversight was not obtained.  The published notice differs from the language that the Court approved.  The most glaring omission was the failure to include any language explaining the release.  Reynolds Declaration ¶ 6.  This information is significant to a class member's decision whether to participate or opt out of the proposed settlement. Indeed, the parties both pointed to the release language as evidence that the notice comported with Due Process.  (Dkt. 131 at 32).  The parties have offered no explanation why this language was omitted from the Published Notice.

Plaintiffs' counsel has belatedly acknowledged the serious error in not protecting class members from Midland's use of current address and banking information.  Dkt.  127, p. 10. However, it claims this concern "can be allayed by a stipulation from Midland…"  *Id*.  Certainly such a stipulation (and order) should be prepared and entered immediately, regardless of whether the settlement is approved.  Unfortunately, this does not cure the evils of the claim form.  First, it will be exceedingly difficult to determine whether Midland violates the order, and much of this information may already have been sent to collection counsel.  Second, it comes too late for those class members who might otherwise have wished to either participate or to opt out but did not do so because they were required to provide their current address and phone number, highly useful information to a debt collector.  The fact that adequate protections were not secured *before* the notice was sent likely explains why 90 percent of the class did not respond at all.

In light of the numerous deficiencies in the Notice, class members' due process rights would be violated if this Court were to now approve the proposed settlement.

## IV. NATIONWIDE CLASS CERTIFICATION IS NOT WARRANTED

In seeking approval of the proposed class action settlement, the parties have acted as if class certification of a nationwide class were a foregone conclusion upon presentation of the proposed agreement.  Such a view was soundly rejected in *Amchem Products v. Windsor*, 521 U.S. 591 (1997).  As the court noted in *Amchem*, to ensure fairness, the parties must demonstrate

to the Court that a settlement class indeed may be certified.  *Id.* at 622.  With one exception, the parties must affirmatively show that all of the requirements of Rule 23(a) and 23(b)(3) are met. The one and only difference between certification of a contested class and certification of a settlement class is that "a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."  *Amchem*, 521 U.S. at 620 (citation omitted).  Indeed, the proponents of simultaneous class certification and settlement face heightened scrutiny.  *Id.*  Thus, other than as to manageability, their burden is higher than if settlement were not also being sought.

There are at least two required showings for class certification in this context that the parties have not made: adequacy of the proposed class representatives, and superiority of a nationwide class action.

### A.      Plaintiffs Cannot Establish Adequacy of Representation

The adequacy of representation, by both the class representative and class counsel, is one of the factors under *Amchem* that stands with undiminished force when a class is to be certified in settlement rather than after a contested proceeding.  *Amchem Products*, 521 U.S. at 620, 625-626.  The adequacy of representation inquiry has two components intended to assure that the absentees' interests are fully pursued: it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees', and it tests the qualifications of the counsel to represent the class. *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, *supra*, 55 F.3d at 800.

Here, there has been absolutely no showing that the named plaintiffs are adequate representatives, a concern because class representatives have been "willing to throw to the winds [other class members' claims] in order to settle their own." *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 17 n.6 (2d Cir. 1981). The settling parties' submissions in support of the settlement do not provide any information about the class representatives at all. None of the potential class representatives has filed a declaration in support of the final approval of the settlement, let alone in support of their claim to adequately represent a nationwide class in

that settlement.   Nor have any of them, other than Ms. Brent, been deposed in this litigation. Thus, this Court does not know, for example, whether they have a personal relationship with or are employed by class counsel, which would render them inadequate.  *See, e.g.*, *Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102, 104 (5th Cir. 1978).  Nor does this Court know if they suffer from any other infirmities that would render them inadequate.  *See, e.g.*, *In re Tableware Antitrust Litigl,* 241 F.R.D. 644, 649-650 (N.D. Cal. 2007) (representative must have some familiarity with the case). Therefore, on the basis of lack of information alone, the Court should find that the settling parties have failed to carry their burden to establish adequacy of representation.

An additional reason to reject the proposed representatives is that adequacy requires representatives who are similarly situated to the absent class members.  The proposed representatives are not so situated.

The class consists of:

> All natural persons (a) sued in the name of Encore Capital Group, Inc., Midland Funding LLC, Midland Credit Management, Inc., or any other Encore and/or Midland-related entity (collectively, "Midland"), (b) between January 1, 2005 and the date the Order of Preliminary Approval of Class Action Settlement is entered by the Court, (c) in any debt collection lawsuit in any court (d) where an affidavit attesting to facts about the underlying debt was used by Midland in connection with the debt collection lawsuit.

The proposed definition does not distinguish among class members whose claims have been resolved and class members who currently have claims pending against Midland.  Thus, there are two distinct groups of class members whose claims will be resolved in this litigation but both are treated in the same fashion.  Class members who have already litigated their claims against Midland are unlikely to care about the broad release.  Those with current or unfiled claims, however, are in a far different situation.  Compounding this problem is the fact that the proposed settlement would eliminate the named representatives' debts to Midland.  None of the named representatives can therefore adequately represent those class members with current or

18

unasserted claims whose litigation objective is to obtain the very benefit that the named representatives will enjoy, relief from their debt.

In this respect, the settlement in its current form creates a serious intra-class conflict between those class members who are currently involved in litigation with Midland (or those who have not yet asserted claims) and those who have resolved all such claims.  The U.S. Supreme Court has held that this sort of conflict renders the class representatives inadequate as a matter of law.  *See Amchem Products, Inc v. Windsor,* 521 U.S. 591, 625-26 (1997).  Moreover, as noted above, the fact that the class representatives' debts are being released, coupled with the incentive awards which counsel has requested for them, creates an irreconcilable conflict of interest with class members who will receive a *de minimus* amount at best and will be deprived of the right to bring FDCPA claims and to contest judgments that were obtained using false affidavits.

### B.    Plaintiffs Cannot Establish Superiority

The Court has not been provided with any analysis that could support a conclusion, required under Rule 23 (b)(3) for a damages class action, that nationwide class action is "superior" to other available methods for fairly and efficiently adjudicating the controversy that is presented.  Such a finding is especially important here given the existence of other pending class and individual actions alleging violations of the laws of the states in which they are venued.  *See* Rule 23(b)(3)(B) (Court should consider "the extent and nature of any litigation concerning the controversy already begun by or against class members.").  The parties plainly know of the existence of these cases.  To ask this Court to certify a nationwide class and not even attempt to demonstrate that it is superior to permitting these other actions to proceed in due course is inexcusable and unfathomable.  Without this, the settling parties clearly have not met their burden to show superiority.

To permit a class action to be maintained, the district court must find, among other things, "that a class action is superior to other available methods for the fair and efficient

adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  The Rule specifies that the Court

must consider the following factors in making this determination:

> (A) the class members' interests in individually controlling the prosecution
> or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy
> already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the
> claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Manageability is the only one of the four factors that the Court need not consider in

evaluating the superiority of a settlement class.  *Amchem Prods. v. Windsor*, 521 U.S. 591, 620

(1997) Moreover, "other specifications of the rule--those designed to protect absentees by

blocking unwarranted or overbroad class definitions-- demand *undiluted, even heightened,*

*attention in the settlement context*."  *Id*. (emphasis added).  In fact, as the record demonstrates,

all three factors weigh against certification here.

As objectors and *amici* have demonstrated, individual class members have a strong

interest in controlling the prosecution or defense of separate actions.  Class members who have

been sued by Midland have individual claims based upon the fraudulent affidavits.  These claims

are much more valuable than the *de minimus* amounts that the proposed settlement would, at

most, provide.  In many cases, the existence of a cross complaint for violation of the FDCPA or a

CPA may cause Midland to dismiss its collection suit entirely.  As discussed, this is precisely the

relief that Midland is affording to the named plaintiffs, while at the same time actively

precluding it for class members.

The extent of litigation already commenced by class members also weighs against

certification.  Class action litigation asserting appropriate state law claims has already been

commenced in California, Washington, Virginia, and Mississippi; others are highly likely, and a

myriad of individual claims are pending throughout the country.

The California action, for example includes claims and remedies brought on behalf of California citizens under applicable state laws that simply were not, and are not, available under federal law and/or to residents of many other states.  *See* Pg 3 above.  Nonetheless these special rights are not recognized in the proposed nationwide settlement in this action.  To the contrary, the release included in the settlement will deprive the California class members of the protections they are entitled to under their state laws for no valuable consideration or compensation.  Under *Amchem*, courts must give "heightened scrutiny to cases in which class members may have claims of different strength." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  Here, such scrutiny will show that the California class is entitled to separate representation.

Furthermore, the California action includes separate claims against the California law firm that frequently represents Midland in these cases.  Plaintiffs allege that Midland's lawyers have committed independent state law violations by filing thousands of cases without prior reasonable investigation and meaningful attorney involvement.  This Court has little interest in policing those lawyers' actions in California State Court.  On the other hand, the California Courts have a vital interest in protecting the integrity of the California Court system.  Thus, even if it is *possible*, it is not *desirable* to resolve all claims in this forum and a nationwide settlement should not be approved.

The parties utterly failed to provide the Court with facts or legal argument supporting class certification in this matter.  Moreover, the facts in the record thus far demonstrate that the instant class representatives are not adequate and a nationwide settlement class is not the superior means to resolve claims against these defendants.  The parties have offered no analysis of other state laws, much less one that demonstrates superiority of a nationwide class.  Accordingly, this Court should refuse to certify a nationwide settlement class.

## V.  CONCLUSION

For each of the independent reasons discussed above, this Court should, in the exercise of its fiduciary duty to the class, disapprove the current settlement agreement: the proposed settlement is contrary to the best interests of the class as a whole, the notices to the class were woefully inadequate and misleading, and a nationwide class can not reasonably be certified in this case.  Any one of these deficiencies would be fatal to approval; together they demonstrate that approval would be a grave injustice to the class, one that will cause great harm.

Date:  July 8, 2011                                         Respectfully Submitted,

/s/ Reginald S. Jackson, Jr.
Reginald S. Jackson, Jr. (0003558)
E-Mail: rjackson@cjc-law.com
Adam S. Nightingale (0079095)
E-Mail: anightingale@cjc-law.com
CONNELLY, JACKSON & COLLIER LLP
405 Madison Avenue, Suite 2300
Toledo, Ohio 43604
Telephone:  (419) 243-2100
Facsimile:   (419) 243-7119

and

| | |
|---|---|
| LEONARD A. BENNETT, VSB#37523<br>CONSUMER LITIGATION ASSOCIATES, P.C.<br>12515 Warwick Boulevard, Suite 100<br>Newport News, VA 23606<br>(757) 930-3660<br>(757) 930-3662 facsimile<br>lenbennett@clalegal.com | Daniel E. Birkhaeuser (admitted *Pro Hac Vice*)<br>BRAMSON PLUTZIK MAHLER &<br>BIRKHAEUSER, LLP<br>2125 Oak Grove Road, Suite 120<br>Walnut Creek, CA  94598<br>Telephone:  925-945-0200<br>Facsimile:  925-945-8792<br>Email:  dbirkhaeuser@bramsonplutzik.com |
| MATTHEW J. ERAUSQUIN, VSB#65434<br>CONSUMER LITIGATION ASSOCIATES, P.C.<br>1800 Diagonal Road, Suite 600<br>Alexandria, VA 22314<br>(703) 273-7770<br>(888) 892-3512 facsimile<br>Email: matt@clalegal.com | THE NATIONAL CONSUMER LAW CENTER<br>Charles Delbaum<br>Stuart Rossman<br>7 Winthrop Square, 4th Fl.<br>Boston, MA  02110<br>Telephone: (617) 542-8010<br>Facsimile:  (617) 542-8028<br>Email:  cdelbaum@nclc.org |

| LAW OFFICE OF IAN CHOWDHURY<br>Ian D. Chowdhury (Bar No. 199018)<br>8853 Fullbright Avenue<br>Winnetka, CA  91306<br>Telephone: (818) 407-0510<br>Facsimile:  (818) 337-2215<br>Email:  ian@ianchowdhury.com | |

## PROOF OF SERVICE AND CERTIFICATION

This is to certify that a copy of the foregoing has been filed electronically this 8th day of July, 2011.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

The filers of this memorandum were granted leave to exceed the page limitations imposed by the Local Rules of this Court.

By   /s/ Reginald S. Jackson, Jr.   
*Counsel for Robert Clawson and Ladon Herring*